Petition of REPUBLIC OF FRANCE, as Owner, and of Compagnie Generale Transatlantique, as Agent, of THE Steamship GRANDCAMP, in a Cause of Exoneration from and Limitation of Liability.

No. 1870.

United States District Court
S. D. Texas,
Galveston Division.
March 9, 1959.

**500**

Clarence S. Eastham, of Eastham, Dale & Forney, Houston, Tex., and Edwin Longcope, of Hill, Betts & Nash, New York City, for petitioners.

William B. Butler, U. S. Atty., and James E. Ross, Asst. U. S. Atty., Houston, Tex., and Dale M. Green, Dept. of Justice, Spokane, Wash., for claimant United States.

Preston Shirley, of McLeod, Mills, Shirley & Alexander, Galveston, Tex., for claimant Texas City Terminal Ry. Co.

CONNALLY, District Judge.

### Statement of the Case

This is a proceeding by petitioners, who allege that they are the owner, and agent or operator of the S. S. Grandcamp, for exoneration from or limitation of liability resulting from the fire upon, and explosion of, that vessel while she was loading a cargo of Fertilizer Grade Ammonium Nitrate at Texas City, Texas, April 16, 1947. This was the now famous Texas City Disaster of April 16–17, 1947, wherein in excess of 500 persons lost their lives, some 3,000 received personal injuries, and tremendous property loss was suffered.

In connection therewith, I make the following findings of fact and conclusions of law:

### Findings of Fact

*The Parties:*

1. The petitioners are the Republic of France and the Compagnie Generale Transatlantique. First named petitioner is a political sovereign, and was owner of the S. S. Grandcamp on April 16, 1947, and for a matter of several months prior thereto. The second named petitioner (commonly known, and referred to hereafter, as the French Line) is a corporation organized under the laws of France, who operates vessels owned by the Republic of France under a contract (Contrat de Gerance), which is in evidence (Pet.Exh. 15). The French government owns in excess of eighty (80%) percent of the stock of the French Line, appoints a majority of its board of directors, and in effect dominates and controls its management and operations.

2. There were originally many hundreds of claimants in the action. Those who remain are the United States of America and a relatively few others. The United States is claimant in a dual capacity. As successor to the Reconstruction Finance Corporation, it asserts a claim for loss of property in the amount of some $350,000. Far overshadowing this, however, it makes claim as assignee of many hundreds of claims for death, personal injury and property damage. These assignments were executed by the assignors in favor of the United States when, under the Texas City Relief Statute (Act Aug. 12, 1955, Chapter 864, Public Law 378, 84th Congress, 69 Stat. 707), the United States paid out approximately $16,000,000 to the victims of the disaster, or their beneficiaries. The United States seeks to recover not only what was paid, but asks recovery of the damages allegedly suffered by each of such assignors, in the amount of approximately $70,000,000.

3. In the initial stages of this proceeding, these assignors were likewise parties here, making claim in their own behalf, and in their own name, for the excess between the amount paid to them by the United States, and what they contended to be the extent of their damage. As the assignment in each instance was absolute and unqualified, these claimants were dismissed.

4. The claimants who remain (other than the United States) are those who did not accept under the Texas City Relief Statute, and did not assign to the government.

*The Vessel:*

5. The S. S. Grandcamp was an American built Liberty type cargo vessel 422.8 ft. in length, of 7,176 gross and 4,380 net tons registered. She was acquired by the Republic of France from the United States Maritime Commission December 12, 1946. She was delivered to the French Line December 18, 1946, at New York.

6. In connection with the transfer of ownership, the Grandcamp underwent certain repairs, and was extensively surveyed and inspected. She was classed highest rating for vessels of her type by the American Bureau of Shipping, and by Bureau Veritas.

7. The S. S. Grandcamp made her first sailing after transfer to the French on January 11, 1947, carrying a cargo of coal from Newport News, Virginia, to Rouen, France. She sailed from Rouen for Antwerp on January 23, 1947, where she loaded cargo, and sailed from Antwerp February 4, 1947, for South American, Caribbean and Gulf ports. She arrived at Texas City, Texas, April 11, 1947, and berthed at Pier O, for loading of some 2,700 tons of Fertilizer Grade Ammonium Nitrate (FGAN hereafter). Until her arrival at Texas City, her history while in French hands had been without incident.

*Others, Not Parties to the Litigation:*

8. Charles De Guillebon was Master of the Grandcamp, having assumed command January 14, 1947. His service with the French Line began April 3, 1925. Prior to that time, he had attended the French Merchant Marine Officer training schools, served an apprenticeship of two years at sea, and had been licensed as Lieutenant for long sea voyages. He served as subordinate officer aboard various vessels until promoted to Master, Third Class, on January 1, 1947. He was rated consistently high by the Masters under whom he served. He was 47 years old when he died at Texas City in the explosion.

9. E. S. Binnings, Inc. was general freight agent for the French Line in all South Atlantic and Gulf ports, and had been for thirteen years prior to the disaster. Binnings was authorized to procure all usual and necessary repairs; to purchase supplies and other necessaries; to obtain and employ stevedores, and make all other arrangements necessary to the loading or unloading of French Line vessels; to handle personnel problems of crew members; to pay for services or supplies furnished French Line vessels; and to book cargo for transportation aboard such vessels. The

company's main office is in New Orleans, Louisiana, with local offices in the principal Gulf ports. Its Houston office was managed by Olin Lacy; its Galveston office by Edward Westerman.

10. A. D. Suderman Stevedoring Company, an independent stevedoring concern, was engaged by Binnings to load the Grandcamp in Texas City. C. P. Suderman was the outside superintendent for the company, in charge of handling the cargo. Loading of FGAN onto the Grandcamp began at 2:15 p. m. on April 11, 1947, and continued until 8:20 a. m. on April 16, 1947, when Suderman ordered the stevedores out of the holds. At that time, approximately 1,450 tons of FGAN had been stowed in the No. 2 hold, and some 880 tons in the No. 4 hold.

11. Transports Maritime, a department and agency of the French government, was the source through which the French Line received its orders and instructions as to the operation of the government-owned vessels. Maurice Darondeau was the principal Officer of Transports Maritime in the United States, as Chief of its Shipping and Transport Operation in Washington, D. C. It was this department that arranged for the purchase of Liberty ships, including the Grandcamp, from the United States Maritime Commission, following World War II. It delivered these vessels to the companies that would operate them, such as the French Line. This department then instructed the operators where the vessels were to be sent, with all ports of call to be made. Its purpose was to make available the necessary tonnage in every port where there was a cargo to be transported to France.

12. The French Supply Council was an agency of the Republic of France, located and maintained at Washington, D. C., charged with the duties of arranging for and facilitating the purchase of goods for the relief and rehabilitation of France. It secured priority allotments of FGAN from the United States, arranged the details for its shipment, and directed its movement to ports where French vessels were calling. It was in complete charge of all such activities for and on behalf of the French government in the United States.

13. J. D. Latta & Company was the freight forwarder of the FGAN. Shipments of the FGAN from the ordnance plants to Texas City on government forms of bills of lading named the French Supply Council as consignee, c/o J. D. Latta & Company. Latta had offices in Galveston, and forwarded the FGAN to the vessel's operators or agents.

*The Fertilizer Program, and FGAN:*

14. Ammonium nitrate, as one member of a larger family of "nitrates", has been an important item in world-wide commerce and industry for many years. By reason of its high free nitrogen content, it is an excellent fertilizer and plant food. In pure form, ammonium nitrate is a powder, but it readily absorbs moisture, and has a tendency to harden and cake. Hence, in pure form it is difficult to handle and use as a fertilizer.

15. Ammonium nitrate also has been extensively used as a principal ingredient of high explosives, and the facilities of Tennessee Valley Authority, and of several ordnance plants, operated by the United States government during World War II, produced large quantities for this purpose. After the termination of hostilities, the United States, as an occupying power, undertook to extend aid to those areas of France formerly occupied by enemy forces. A number of the ordnance plants, previously deactivated, were reactivated for the purpose of producing and processing ammonium nitrate in fertilizer form. As time was required before such plants could reach maximum production, and with the need for such fertilizer in Europe being acute, in 1946 the United States government entered into a contract with a number of private producers of such ammonium nitrate fertilizer, substantially to the following effect. Such private producers (Lion Oil Company being the one here concerned) made available to the government for

transfer overseas large quantities of such fertilizer which the private producers then had available; and the government agreed thereafter (and when its ordnance plants were back in production) to make available to the private producers the same quantity of fertilizer which they had advanced. The private producers were not required to accept the fertilizer themselves, but might dispose of it as they saw fit; and the government would deliver the quantity concerned upon their order.

16. To make pure ammonium nitrate more readily serviceable as a fertilizer, it was grained and coated to make "Fertilizer Grade Ammonium Nitrate". It was coated first with .75% to 1% of a wax organic coating, either Wax B or PRP (.2% petrolatum, .4% resin, and .2% paraffin). This served to exclude moisture. Additionally, a dusting clay was added as an additional coating, to prevent stickiness. The clay was Kaolin, constituting about 4% of the end product. Hence, FGAN was composed of approximately 95% pure ammonium nitrate, 1% PRP, and 4% Kaolin. This was the same process, resulting in the same material, as had been used by private producers and "loaned" to the United States government previously. It was bagged in six-ply asphalt laminated paper bags, of a net weight of 100 pounds.

17. The FGAN here concerned was produced by Army ordnance plants, and was a part of a quantity repaid to Lion Oil Company under terms of the agreement heretofore mentioned. Walsen Consolidated Mercantile Company of New York, a broker, on behalf of private French interests, bought this quantity from Lion Oil Company. The French Supply Council, representing the French government, secured the necessary allocations for this fertilizer, and made all arrangements for its shipping, etc. This quantity was shipped on government bill of lading from the ordnance plants to Texas City, Texas, consigned to the French Supply Council, c/o J. D. Latta. After arriving by rail in Texas City, the FGAN was unloaded, warehoused by the Texas City Terminal, and was in the process of being loaded, in part upon the Grandcamp, and in part upon the High Flyer, immediately prior to the disaster.[1]

*Ammonium Nitrate:*

18. Despite its use as a principal ingredient of high explosives, at the time of the disaster ammonium nitrate was not, and is not now, classified as an "explosive" for transportation purposes by the Interstate Commerce Commission or the Coast Guard. This is true because it was considered that to cause the detonation of ammonium nitrate, an initial shock or "booster" of considerable magnitude was required. The chances of such an initial or booster detonation being encountered in normal conditions of transportation has always been considered so remote as to be negligible.

19. However, ammonium nitrate—together with other nitrates—has long been known and recognized, not alone by scientists and chemists, but by all informed persons in the transportation industry, as an "oxidizing agent" and a *fire* hazard. It is now, and was long prior to 1947, classified by the Coast Guard as a "dangerous article" (46 C.F.R., 146.22–100; this reference, and others throughout, are to Coast Guard Regulations in effect, and as numbered, on April 16, 1947), and within the sub-class of "inflammable solids and oxidizing materials". An "oxidizing material" or "oxidizing agent" is one which, while not necessarily inflammable itself, decomposes when brought in contact with burning organic matter, and releases oxygen in quantity, thus supporting and encouraging the fire, and causing a more rapid

1. The history of the fertilizer program, the composition, source, and inland transportation of the quantity of present concern is, I believe, without dispute. It is discussed in great detail in the opinion of the United States Supreme Court in Dalehite v. United States, 346 U.S. 15, at pages 18–22, 73 S.Ct. 956, at pages 959–961, 97 L.Ed. 1427, to which I refer.

rate of combustion, and an increase in temperature (46 C.F.R., 146.22–3). Similarly, where an oxidizing agent is present, the fire may not be extinguished by smothering or by eliminating outside sources of oxygen. This is so because abundant oxygen is supplied from the heating of the oxidizing agent.[2] Regulations for its handling and stowage are prescribed by Coast Guard Regulations (46 C.F.R., 146.01–1 et seq.).

*The Disaster:*

20. Prior to her arrival at Texas City April 11, 1947, the No. 4 Hold of the Grandcamp, in which the fire started, had been prepared to receive the FGAN by placing a layer of dunnage across the bottom and partially up the sides. This was covered with a layer of heavy paper. The bags of FGAN were stacked flat, one upon the other, building up layers of the bagged material from the bottom of the hold toward the top. At 8 o'clock a. m. of April 16, 1947, the longshoremen reported for work to continue loading the cargo of FGAN. They descended into the No. 4 Hold, which was then about half filled. At about 8:10 to 8:15 a. m. a thin wisp of smoke was discovered by one of the longshoremen, rising between the cargo battens and the inshore skin of the ship.[3] The longshoremen undertook to extinguish it by pouring their jug of drinking water upon it. This was unsuccessful, and one of the French crewmen brought a portable fire extinguisher. This likewise failed to extinguish the fire. A fire hose (a part of the vessel's fire fighting equipment) was passed from the deck into the hold, but was never used. Several additional portable extinguishers were used without effect. During these early operations, the longshoremen removed several layers of the bags of FGAN in an effort to get at the source of the fire. They were never able to reach the source, though they could see it smoldering beneath them.

21. Despite these early attempts to extinguish the fire, it spread rapidly. Smoke and fumes in the hold became oppressive, and all personnel were ordered out. This was at about 8:20 to 8:25 a. m. Thereupon, the Captain ordered the hatch battened down and covered with tarpaulins, and ordered steam admitted into the hold by use of the vessel's steam smothering system. This was done at about 8:30 a. m. By this time, the Texas City Volunteer Fire Department was arriving, and began stretching their hoses from water lines ashore to the vessel.

22. Within the interval from about 8:30 a. m. to 8:40 a. m., the fire in the No. 4 Hold became much more intense. The hatch covers were partially blown off, and the interior of the hold was emitting great clouds of smoke and vapors. The longshoremen were off the ship. The crew had been ordered to leave the ship, and the Texas City Vounteer Fire Department was aboard and pouring water on the vessel.

23. The Grandcamp exploded at about 9:12 a. m., with tremendous force, and with devastating results. Fire and burning debris were spread throughout the waterfront, as result of which the High Flyer caught fire, and exploded several hours later. Fires raged through re-

2. This was graphically illustrated when one of the expert witnesses performed the following experiment in open Court. It was shown that a small quantity of ammonium nitrate, perhaps the contents of a teacup, would not ignite from the heat of an ordinary wooden match. The same was true of a similar quantity of FGAN. A comparable pile of wood sawdust could only be made to smolder, or burn very feebly, with a match; yet when the sawdust was mixed with the ammonium nitrate, the pile burned fierce-

ly. The same was true when the sawdust was mixed with FGAN. There was no perceptible difference between the behavior of pure ammonium nitrate and FGAN in this respect. The evidence shows further that a fire of sawdust and FGAN, burning within a bottle, is not extinguished when the bottle is capped.

3. This was described by one of the first longshoremen to notice it as about as much smoke as would come from four or five burning cigarettes.

-fineries, gasoline storage tanks, chemical plants, etc., and were not completely controlled for days. Of the 29 members of the Fire Department, two survived. Of the 41 members of the Grandcamp crew, 6 survived.

## Explanatory Statement

The preceding findings are, I believe, without substantial dispute in the evidence. Of those which follow, dealing with negligence and fault, there is much conflicting testimony and impeachment of witnesses. In view of this circumstance, I consider it advisable, in the interest of clarity, to set out here the contentions of the parties in connection with two issues of fact which were the most bitterly contested on the trial, and which in my judgment are crucial to the case. They are as follows:

It is perfectly apparent now that FGAN is nothing more nor less than an impure grade of ammonium nitrate. It has the same characteristics as the pure product, though post-disaster investigations and scientific experiments have shown that the bagged FGAN is slightly more sensitive to fire and explosion than is pure ammonium nitrate. This is so because of the wax coating, and the presence of the bagging paper, which is an organic material and readily inflammable.

The petitioners recognize that, by reason of their long experience and position in the transportation industry, as a matter of fact they are charged with knowledge of the characteristics and propensities of ammonium nitrate and other nitrates. They recognize that as a matter of law they are charged with knowledge of the contents of the pertinent statute and Coast Guard Regulations (46 U.S. C.A. § 170 et seq.; 46 C.F.R., 146.01–1 et seq.) which classify ammonium nitrate as an oxidizing material and inflammable solid, and, as such, as a "dangerous article". They urge very forcefully, however, the contention that the FGAN was in truth and in fact a new product, which only recently had found its way into channels of world commerce. They say

that as a matter of law the statute and regulations pertaining to ammonium nitrate did not and should not apply to FGAN; and as a matter of fact they say that the circumstances which prevail here were not sufficient to put a prudent person on notice or inquiry that the FGAN was or might be a fire or explosive hazard comparable to ammonium nitrate.

The claimants, on the other hand, urge to the contrary; that is, that the FGAN was simply an impure form of ammonium nitrate, and that it was covered by and subject to the same regulations. Claimants contend that under the terms of the statute and regulations, as well as a matter of fact, the petitioners were required to know the nature of their cargo, and to take adequate safety measures when in fact such cargo was hazardous. Additionally, they say that the circumstances here were such as to charge any prudent person with knowledge, or at least to put such person on inquiry, that the FGAN was essentially the same material as ammonium nitrate.

The second issue, which I conceive to be of primary importance, is the fact question as to the cause of the fire in the No. 4 hold. The petitioners have offered much expert testimony tending to show that the fire could, and likely did, result from so-called "spontaneous ignition". Reduced to its simplest terms, the expert testimony offered on petitioners' behalf was that a quantity of ammonium nitrate will, when heated to a certain point, thereafter generate additional heat on its own, and thus increase the temperature of the mass after the source of outside heat is withdrawn. This is likewise true of FGAN, with its increased sensitivity to fire by reason of the coating and bagging. The evidence shows that the FGAN was bagged at the ordnance plants at temperatures which, by some of the testimony approached, and by other testimony exceeded, the danger point in this respect. It is the petitioners' theory that when the quantity of FGAN was loaded in the No. 4 hold on the days preceding the disaster, the con-

tents of the bags were very hot by reason of excessively high temperatures at which it was bagged at the ordnance plants; and as the bags were tightly packed one against the other, the mass tended to increase in temperature as mentioned above, until such time as combustion of the paper bagging and wooden dunnage took place.

The claimants contend that the more likely cause of the fire was careless smoking by the longshoremen in the hold, or perhaps by crew members on the deck. There is a sharp conflict in the testimony as to what, if any, precautions against smoking were taken by Captain De Guillebon, and as to whether smoking was permitted, or took place. There is considerable evidence tending to support each theory.

*Negligence and Fault:*

■ 24. The petitioners, as owner and operator of the Grandcamp (and with long experience in transporting cargoes of nitrates); the French Supply Council, as shipper; Captain De Guillebon, as Master of the Grandcamp; E. S. Binnings, Inc., as the ship's agent; and A. D. Suderman Stevedoring Company, all are chargeable as a matter of fact and of law with knowledge that *ammonium nitrate* (as distinguished from FGAN) is and was an oxidizing agent;

and a fire hazard; and that ammonium nitrate was a "dangerous article" within the purview of the statutes and Coast Guard Regulations dealing therewith (46 U.S.C.A. § 170 et seq.; 46 C.F.R. 146.-02–3, 146.02–4, et seq.).[4]

■ 25. The petitioner Republic of France, through its agencies, the French Supply Council and French Transport Mission, had actual knowledge, from the inception of the fertilizer program in the summer of 1945, to and including the day of the disaster, that the fertilizer furnished under this program, and referred to herein as FGAN, was essentially ammonium nitrate; and frequently referred to the commodity in correspondence concerning lend-lease requisitions, invoices, shipping instructions, and contracts of sale, simply as "ammonium nitrate", or occasionally as "nitrate" or "nitrate fertilizer".[5]

26. J. D. Latta likewise had actual knowledge from the summer of 1945 forward that the product FGAN was essentially ammonium nitrate.

27. The petitioner, the French Line, Captain De Guillebon, E. S. Binnings, Inc., and Robert Estachy, either had actual knowledge that the commodity FGAN was essentially ammonium nitrate, or had constructive notice of this fact. Circumstances shown by the evi-

4. The evidence shows that prior to the disaster there was an abundance of information available in the shipping trade as to the hazards of ammonium nitrate. In addition to the Coast Guard Regulations, some of the others cited were, "Modern Ship Stowage" by Leeming; "Dangerous Goods" by Aeby; "Seamanship for the Merchant Service" by Reisenberg; other sources of information were "Carriage of Dangerous Goods and Explosives in Ships" (1933) by the British Board of Trade (Gov't Exh. 15); National Board of Fire Underwriters summary of fire and explosive hazards of ammonium nitrate (1933) (Pet.Exh. 82); Regulations of the French Ministry of Public Transportation (1945) (Gov't Exh. 20); "Explosive and Fire Hazards of Ammonium Nitrate Fertilizer", U. S. Department of Agriculture Circular No. 719 (1945); U. S. Ordnance Safety Manual (1941). Additionally, reference

is made to Technical Report 1658 of the Picatinny Arsenal (Pet.Exh. 81), published following the disaster, but listing many sources of information available prior to the disaster, dealing with the hazards of ammonium nitrate, and the precautions that should be observed in its handling.

The tremendous ammonium nitrate explosion at Oppau, Germany, in 1921, and the fires and explosions on board the vessels S.S. Hallfried in 1920, the S.S. Muenchen in 1931, and the S.S. Gisla in 1936, appear to have received widespread publicity in the shipping trade.

5. The various documents composing Gov't Exh. 8 and 9 are replete with instances wherein the heads of the various departments, representing the Government of France in the acquisition and transportation of the commodity, refer to it in the manner stated.

dence are such as to arouse the suspicion of any prudent person who was alerted to the hazards of ammonium nitrate, and to put him on inquiry that FGAN well might present the same hazards.[6]

28. During the loading of the Grandcamp at Texas City on April 11–16, no adequate precautions were taken by her Master, her agent or anyone else, to prevent smoking aboard the vessel. There were no signs posted prohibiting smoking (at least, none in English, and intelligible to the longshoremen). No ship's officer, or other person, was detailed to police the holds or the deck to prevent smoking.

29. By reason of the foregoing, the longshoremen were permitted to, and did, smoke promiscuously in the No. 2 and No. 4 holds of the vessel, and on the deck. Members of the crew smoked on the deck of the vessel.

30. The fire of April 16 resulted from this smoking by longshoremen in the No. 4 hold shortly after 8 a. m. of that date, and had its origin in a carelessly discarded cigarette or match.[7]

6. Some of the circumstances which would tend indisputably to show to any prudent and reasonably intelligent person that the FGAN well might be the same as ammonium nitrate are these:

(1) The very name of the commodity, *Fertilizer Grade* Ammonium Nitrate would tend to show it is merely an impure grade of ammonium nitrate.

(2) Each 100-lb. bag was marked in large type:

"Fertilizer
Ammonium Nitrate"

or:

"Ammonium Nitrate
Fertilizer" (Pet.Exh. 64).

(3) The cargo manifest for the Grandcamp, prepared by Binnings, refers to the commodity as "bags of ammonium nitrate fertilizer" (Gov't Exh. 3).

(4) The ocean bill of lading prepared "for the Captain of the vessel and on behalf of the Government of France", which was never executed because of the disaster, refers to the commodity as "ammonium nitrate fertilizer" (Pet.Exh. 54).

(5) The inland bills of lading (Gov't Exh. 23), under which the FGAN moved from the ordnance plant to Texas City refer to the commodity as "fertilizer compound, (Manufactured fertilizer), NOIBN, Dry, in paper bags". The petitioners lay great stress on the fact that the FGAN is described thus in each of these documents, and argue that there is nothing in such description to arouse suspicion, or to suggest that it is a *nitrate* fertilizer. In every instance, however, the description just quoted is followed on the bill of lading by the additional description "(Fertilizer Grade Ammonium Nitrate)". The evidence shows that the description first quoted was used to qualify the product for a favorable railroad tariff.

(6) The New York Board of Fire Underwriters, in a letter to "All Surveyors" well prior to the date of the disaster, advised that ammonium nitrate and ammonium nitrate fertilizer have the same characteristics, and for transportation purposes should be treated as the same commodity (Gov't Exh. 13). The evidence does not show whether a copy of this communication came to the attention of the parties here concerned.

It is interesting to note that Olin Lacy, Manager for Binnings, was suspicious of the commodity. He made inquiry of his New Orleans office, of a friend at Lykes Bros., and perhaps of others, as to how the FGAN should be stowed, and whether any special precautions were required. As result thereof, he directed only that the FGAN be stowed separately from other cargo. He did not advise the Captain of any hazards of fire or explosion.

7. Whether the fire on the Grandcamp began from spontaneous combustion, or as a result of careless smoking, has been a hotly disputed issue not only in this trial, but in every investigation, hearing, and trial involving the disaster since its occurrence. The truth likely will never be known with any degree of certainty. It is noted that Judge Kennerly, of this Court, found spontaneous combustion to be the cause in his findings in Dalehite v. United States. On appeal (In re Texas City Disaster Litigation, 5 Cir., 197 F.2d 771), the Court reversed and rendered, with three of the six Judges (Chief Judge Hutcheson, Judges Borah and Strum) expressing the view that the trial court findings were clearly erroneous. The United States Supreme Court affirmed (Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L. Ed. 1427). Similarly, the FGAN explosion of the Ocean Liberty in the harbor at Brest, France, July 17, 1947, was attributed by the trial court to spontaneous ignition (Accinanto, Ltd. v.

**508**

31. The failure of the Master to promulgate and enforce "no smoking" regulations in the holds of the vessel, and upon the deck, constituted fault and negligence, which negligence had a direct and causal connection with the ensuing fire and explosion.

**32.** The Master could and reasonably should have foreseen and antici- pated the danger of a disastrous fire, with the *possibility* of explosion, in failing to prevent smoking in the presence or proximity of the FGAN. His negligence in this regard constituted a proximate cause of the fire, the resultant explosion, and the damages which ensued.[8]

**33.** The recognized and accepted method of fighting a fire *in the presence*

Cosmopolitan Shipping, Inc., D.C., 99 F. Supp. 261, affirmed A/S J. Ludwig Mowinckels Pederi v. Accinanto, Ltd., 4 Cir., 199 F.2d 134.

There is much scientific and technical opinion to the contrary. Of the view that spontaneous ignition was not the cause, and that careless smoking was the most plausible explanation of the source of the fire is the report of the Inter-Agency Committee (quoted and Referred to in Pet.Exh. 82). This group of distinguished scientists was appointed by the Secretary of the Treasury following the disaster "to study every possible hazardous aspect of ammonium nitrate and develop additional information relative to such hazards in transportation, handling and stowage, and to recommend a national policy in conformity with these objectives". The Bureau of Mines Report (Pet.Exh. 82) contains an exhaustive study of all events leading up to the disaster, and contains among its other conclusions the following: "That fire caused by carelessness of men smoking is believed to have been the primary cause of the disaster". To the same general effect is the Picatinny Arsenal Report by Wm. H. Rinkenbach (Pet.Exh. 79). Exh. 82 likewise discloses that the findings of the Board of Investigation of the United States Coast Guard, made immediately following the disaster, were to the same effect (Pet.Exh. 82, p. 32).

Disregarding the opinion and findings of others for the moment, some of the circumstances which appear to me strongly to indicate careless smoking as the cause are (1) that a long period of time (probably several weeks) elapsed from the bagging of the FGAN at the ordnance plants until the disaster. During this interval the bags were loaded aboard freight cars, transported to Texas City and unloaded. There they were warehoused and again handled individually in being loaded aboard pallets for lifting aboard the vessel. The temperature was shown to have been generally cool for a number of days before the disaster, and there was ample time for cooling and dissipation of heat. While some of the longshoremen found the bags warm to the touch, they handled them without gloves, and the bags were not sufficiently hot to burn the hand. Additionally, when the longshoremen entered the hold the morning of April 16, no fumes, gases or heat were encountered. This would have been expected if the FGAN was being decomposed from heat, and before a flame was present. Also, the fire, when discovered, was between the cargo battens and the skin of the ship, not in the center or an insulated area of the stowage. In a carefully conducted experiment, after the disaster, on a vessel similarly loaded with FGAN, the loaded FGAN showed no tendency to heat, and showed that the commodity varied in temperature with the surrounding atmosphere.

It is clear that a lighted cigarette or burning match readily could cause the bagging paper in contact with FGAN to ignite. While there was some impeachment of this testimony, a number of longshoremen testified as to the smoking in the holds of the Grandcamp during loading operations (TR. 694, 717, 832, 900, 911, 919 and 959). I cannot believe all of this testimony to be erroneous or false.

Finally, it is noted that one of the longshoremen (Spencer, TR. 958) testified that on the day before the disaster a small fire caused by a burning cigarette had broken out in the No. 2 hold, and had been promptly extinguished by the longshoremen.

8. In connection with this finding as to "foreseeability", it is undoubtedly true that the force and devastating effects of this explosion shocked and surprised the scientific field as well as the transportation industry. What was not generally recognized before Texas City was. (a) that ammonium nitrate would cause a detonation of such magnitude in the absence of great confinement and pressure (as within a bomb), and (b) that fire and heat alone would cause such detonation, without an initial or booster detonation; or, according to one theory,

*of an oxidizing material*—both now and before the disaster—was to douse the fire with large quantities of water. This tends to cool the mass of oxidizing material, and to extinguish the burning organic matter. The use of the vessel's steam smothering system—a well-recognized and generally effective method of combatting a fire of organic materials in a ship's hold—is not effective in fighting a fire in the presence of an oxidizing material.

34. Captain De Guillebon ordered that the fire hose, which was readily available in the No. 4 hold within moments after the fire was discovered, not be used, for fear of unnecessarily damaging the cargo. Later, after the men were driven from the hold by the intensity of the fumes and smoke, he ordered the hold and ventilators closed, and steam injected into the hold in an attempt to smother the fire. This had the effect of raising the temperature of all the oxidizing material within the hold, and of confining the resulting gases and fumes. The fire thus became more intense, and in a few minutes was beyond the control of the ship's personnel and of the Texas City Fire Department.

35. I find the Master to have been negligent and at fault in failing to make use of the fire hose to quench the fire in its incipient stage; and in using

steam in an effort to smother the fire after it had progressed to a point of dangerous proportions.[9]

36. This negligence constituted a proximate cause of the disaster and the ensuing damage, in that it appears highly probable that the prompt use of copious quantities of water from the hose would have extinguished the fire in its early stages.

37. In hoisting the bags of FGAN from the wharf by means of pallets, and lowering same into the holds of the Grandcamp, from time to time some of the paper bags became torn and broken. The longshoremen in the hold did not refuse these bags, or return them for rebagging, but loaded them as best they could aboard the vessel. By this means, there was much spillage of the contents.

38. The acceptance of such broken bags aboard the vessel constituted a violation of Coast Guard Regulation 146.02–14, and constituted fault and negligence on the part of the Master.

39. This fault and negligence was a proximate and contributing cause of the disaster, in that the presence of such loose and unbagged FGAN increased the susceptibility to fire of the stow, the dunnage, and bagging paper.

40. At the time of, and immediately before, the disaster, the S. S.

with such initial detonation resulting from an explosion of accumulated gases, which in turn come from the heated and decomposing ammonium nitrate.

From the literature and information generally available, I do not believe that, in the exercise of ordinary care, the Master could have foreseen the probability of an explosion *of this sort*, even in the presence of fire. This finding should be interpreted in this light, and is based on the premises that, as he could foresee *danger from fire from his negligent conduct*, the "foreseeability" test is met, and it is not necessary that he be able to foresee the *extent* of the damage which may ensue.

9. One now may only speculate as to what passed through the mind of Captain De Guillebon in the relatively short period available to him in combatting the fire.

From his training, and from the precautions against fire which were taken in loading cotton in Houston April 7–10, one would conclude that the Captain was not a careless person.

After much thought, I am convinced that the truth of the matter is this. The negligent conduct of those present on the waterfront immediately before the disaster did not stem from any failure to connect FGAN with ammonium nitrate in their own thinking. Rather, I think it clear that none of them—De Guillebon, Lacy, Suderman or Latta—in fact recognized the dangers inherent in ammonium nitrate. While, as heretofore noted, there was a wealth of information available in connection therewith, *as to these individuals* ammonium nitrate was a new cargo. The same is true, I think, of Estachy.

Grandcamp was unseaworthy because not properly manned, in that her Captain was unaware of the nature of the cargo which she was in the process of receiving, of its dangerous propensities, or how to guard against or combat such dangers.

41. The petitioner Republic of France was "in privity and knowledge" with the unseaworthy condition referred to in the finding next above, in that through the French Supply Council, as shipper, she failed to comply with Coast Guard Regulation 146.05–13, directing that the shipper of a dangerous cargo furnish information with respect thereto to the vessel or her agent.

42. The petitioner French Line was "in privity and knowledge" with the unseaworthy condition referred to in Finding No. 40 above, in that she failed to know or to learn, from information readily available, the nature and character of the cargo accepted, and neglected and failed to inform the Master fully in connection therewith.[10]

43. At the time of, and immediately before, the disaster, the S. S. Grandcamp was unseaworthy in that she was dangerously and improperly loaded by reason of the presence in Hold No. 4 of a number of broken bags of a "dangerous article", with the contents thereof spilled, as forbidden by Coast Guard Regulation 146.02–14(a).

44. Petitioner the French Line was "in privity and knowledge" of such unseaworthy condition, in that Robert Estachy, in charge of all of the Line's business in Gulf and South Atlantic ports, had personal knowledge of the habit of the loading of FGAN in a loose and bulk condition when the bags were broken, and acquiesced in the practice.

45. The petitioner Republic of France, through the French Supply Council, as shipper, while possessed of actual knowledge of the characteristics of the cargo, failed to furnish to Binnings, the ship's agent, or to the Master of the Grandcamp, a written "originating shipping order", informing them or either of them of the characteristics of the cargo of FGAN, in advance of the tender of the cargo to the vessel for loading, as required by Coast Guard Regulation 146.05–13 (46 C.F.R.).

46. This failure to furnish the information thus called for constituted negligence on the part of the French Supply Council, and the petitioner Republic of France.

47. Such negligence in failing to furnish the information thus called for was a proximate and contributing cause of the disaster and the ensuing damage.

48. The petitioner French Line was at fault in accepting a cargo which it knew, or should have known, to be a

---

10. Robert Estachy was the superintendent for the French Line in the southern United States, in charge of all business of the line from Charleston to the Mexican border. His headquarters were in New Orleans. He worked in very close touch with E. S. Binnings in husbanding all of the French Line vessels in the various Gulf and South Atlantic ports.

Estachy was familiar with I.C.C. Regulations, and with Coast Guard Regulations, and in general with those dealing with dangerous cargoes.

The Grandcamp was the third French Line vessel to load FGAN at Texas City, having been preceded by the matter of a few months by the Argentan and the Lieutenant Lemuir. Estachy had gone to Texas City when the movement of fertilizer began "to see what was going on on the first one".

In observing the loading of the earlier vessels, Estachy saw that many of the bags were broken, and much such loading was done with shovels, "it was more bulk than bag cargo". Estachy knew that it was fertilizer that was being loaded, and the shipping documents showed that it was ammonium nitrate fertilizer. He had general information concerning the cargo of Chilean nitrates to France before the war, for use as a fertilizer, but was not familiar (before the disaster) with "oxidizing materials", and did not know that nitrates were a hazardous cargo, because no one had ever told him that such was the case.

Of course, he gave no warning to Captain De Guillebon, or anyone else, concerning the cargo aboard the Grandcamp.

"dangerous article" without demanding from the shipper an originating shipping order containing the shipper's certification that compliance was had with § 146.05–11, as required by Coast Guard Regulation 146.06–1 (46 C.F.R.).

49. The Grandcamp was loading, or had loaded, her principal cargo for return to France in the Houston-Texas City-Galveston area, and was scheduled thereafter to return to France.

50. At all material times the petitioner, the French Line, under terms of the Contrat de Gerance (Pet.Exh. 15), was a charterer or owner *pro hac vice* of the S. S. Grandcamp, manning, victualing and navigating the vessel by its own procurement.

51. The United States Government was the manufacturer, supplier, and inland shipper of the quantity of FGAN herein involved, and placed the product in the channels of commerce. The rail transportation from the point of manufacture to Texas City complied in all respects with I.C.C. regulations. Without determining whether the United States may have been at fault in any particular in connection with the manufacture or shipping of the FGAN, or, if so, the effect thereof as to the various types of claims which the United States asserts, if there be such negligence it was not the *sole* cause of the disaster (as petitioners contend).

### Conclusions of Law

1. This Court has jurisdiction of this proceeding.

2. The petitioner Republic of France is entitled to petition for exoneration from or limitation of liability under 46 U.S.C.A. § 183, as owner of the Grandcamp.

3. Under its Contrat de Gerance (Pet.Exh. 15), the petitioner French Line was charterer of the Grandcamp within the terms of § 186 of Title 46 U.S.C.A., in that she manned, victualed and navigated the vessel by her own procurement, and hence is entitled to petition for exoneration from or limitation

of liability. In re Petition of the United States, 3 Cir., 259 F.2d 608.

4. The petitioner, the French Line, as carrier, was under the duty to use due care to ascertain the nature and characteristics of the cargo accepted, and, as a matter of law, chargeable with the knowledge which reasonable inquiry and investigation would have disclosed. (The Willfaro, D.C., 9 F.2d 940; The Richelieu, 4 Cir., 48 F.2d 497; Anderson v. Lorentzen, 2 Cir., 160 F.2d 173. The French Line breached this duty in the particulars heretofore set out (see particularly Fact Findings 27, 40, 42). Texas & Gulf S. S. Co. v. Parker, 5 Cir., 263 F. 864; The Silver Palm, 9 Cir., 94 F.2d 776.

5. The French Supply Council, as shipper, breached its statutory duty to give warning of the nature of the dangerous cargo tendered (see particularly Fact Findings 25, 41, 45); and its relation with the petitioner Republic of France, was such, as a matter of law, to render that petitioner responsible for and in privity with such fault.

6. While E. S. Binnings & Company was general freight agent for the petitioner French Line in Gulf ports, the relation was not such as to constitute Binnings a "managing agent" within terms of § 183(e), Title 46 U.S.C.A.

7. Robert Estachy, as superintendent for the French Line in Gulf and South Atlantic ports, was in general charge and supervision of all of the line's activities within that area; and was "superintendent or managing agent" of petitioner the French Line within the terms of § 183(e), Title 46 U.S.C.A. Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363; The City of Brunswick, D.C., 6 F.Supp. 597.

8. Coast Guard regulations and related statutes (heretofore referred to in the findings of fact) classifying and referring to ammonium nitrate as a "dangerous article" should be interpreted and construed as applying as well to fertilizer grade ammonium nitrate which,

**512**

as heretofore found, was essentially the same commodity.

9. The "voyage" here in question, within terms of § 183(e), Title 46 U.S.C.A., was the one-way crossing contemplated from Houston-Galveston to France, upon which the Grandcamp was about to embark at the time of the disaster (Benedict on Admiralty, 6th Ed., Vol. 3, p. 400, and cases there cited).

10. Under Admiralty Rule 56, 28 U.S.C.A., petitioners here were entitled to implead the United States in this proceeding, and the motion to that end is allowed.

11. During the trial, testimony was tendered by petitioners as to the circumstances surrounding the loss of the Ocean Liberty. This testimony was substantially to the effect that some two months after the Texas City disaster, the Ocean Liberty was loaded at Baltimore with a partial cargo of FGAN, some of which was of the same origin as that at Texas City; by reason of the recent disaster, every precaution was taken in the loading of the FGAN aboard the Ocean Liberty; after the loading, the hatch or hatches containing the FGAN were closed, and not reopened during the voyage; while unloading in the harbor at Brest, France, immediately following the crossing, smoke was noticed coming from the ventilators of the holds in which the FGAN was stored; the Master had the ventilators closed, the hatches secured, and steam injected into the holds in an effort to smother the fire, and efforts were made to remove the vessel from the harbor; she ran aground after being moved part way out of the harbor; the fire became much more intense, and there was much smoke, gas and fumes; efforts to sink the vessel in the shallow water were unavailing, and she exploded under circumstances much like those of the Grandcamp disaster.

This testimony was offered as tending to show an explosion strikingly similar to that of the Grandcamp, and where there was little opportunity for any foreign matter to have entered the hold and caused the fire. This tended to support the theory of spontaneous ignition.

Objection was made by the United States that there was not sufficient similarity shown for the evidence to be of any probative value; and, further, for the reason that (so counsel stated) there was a certain secret cargo aboard the Ocean Liberty, the nature of which had never been disclosed, and it was suggested that this well may have been of such nature as to have caused the fire. I reserved ruling on all of such testimony, and it was received subject to objection.

It is my view that the objection goes to the weight to be given the testimony, rather than its admissibility; and I have considered the evidence and given it such weight as in my judgment it warranted.

12. From the foregoing, it follows that by reason of the fault and negligence of the petitioners, and the unseaworthiness of the vessel, all of which was within the privity and knowledge of petitioners, neither is entitled to exoneration from or limitation of liability under § 183, Title 46 U.S.C.A.

Clerk will furnish counsel copy of the foregoing findings and conclusions.