THE GIULIA.

(Circuit Court of Appeals, Second Circuit. November 16, 1914.)

No. 13.

1. SHIPPING (§ 132*)—SUIT FOR DAMAGE TO CARGO—BURDEN OF PROOF.

Where it is admitted that merchandise was received on board a vessel in good condition, and delivered at the end of the voyage in bad condition, in order to be relieved from liability under an exception of perils of the sea in the bill of lading, the carrier has the burden of proving that the injury was the result of such untoward circumstances as could not have been anticipated and guarded against by the exercise of ordinary care and prudence.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*]

2. SHIPPING (§ 141*)—LIABILITY FOR DAMAGE TO CARGO—EXEMPTION IN BILL OF LADING—"PERILS OF THE SEA."

The term "perils of the sea," as used in an exemption clause in a bill of lading, is understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature, or arise from irresistible

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 493, 497–499; Dec. Dig. § 141.*

For other definitions, see Words and Phrases, First and Second Series, Perils of the Sea.

Loss by perils of the sea, see notes to The Dunbritton, 19 C. C. A. 465; Southerland-Junes Co., Limited, v. Thynas, 64 C. C. A. 118.]

3. SHIPPING (§ 132*)—LIABILITY FOR DAMAGE TO CARGO—EVIDENCE TO SUSTAIN DEFENSE.

Evidence considered, and *held* not to sustain the burden of proof resting on a vessel to show that damage to cargo by fresh water escaping from a pipe extending from a water tank into the hold was due to perils of the sea, which caused the cargo to move and force the plug from the end of the pipe, but rather to indicate that the plug was not screwed into the pipe, as it should have been, before the commencement of the voyage, thus rendering the ship unseaworthy.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 471–487; Dec. Dig. § 132.*]

Appeal from the District Court of the United States for the Southern District of New York.

This suit comes here on appeal from a decree of the District Court of the United States for the Southern District of New York entered on the 30th day of December, 1912, in favor of the libelants.

The Linen Thread Company is a corporation organized and existing under the laws of the state of New Jersey. The Chelsea Fibre Mills (formerly known as the Chelsea Jute Mills) is a corporation organized and existing under the laws of the state of New York. These two corporations filed a joint libel and complaint against the steamship Giulia, an Austro-Hungarian vessel, which is admitted to have been within the jurisdiction of the court at the time of the filing of the libel.

The libel was filed to recover damages to hemp shipped on board the steamship between the 20th and 28th days of November, 1905; the shipment being made in the port of Venice, kingdom of Italy, the steamship undertaking and agreeing to carry the same to the port of New York and there deliver the same in good order and condition. The bills of lading acknowledged the receipt of the hemp in good order and condition by the steamship. Some of the bills of lading were indorsed by the respective consignees to the Linen Thread Company and others were indorsed to the Chelsea Fibre Mills. On the arrival of the steamship in the port of New York in January, 1906, the bales of hemp were delivered in a wet and damaged condition.

The hemp was stored in the forward compartment of the between decks, and the libelants alleged that the damage was due to fresh water which flowed into the compartment from fresh water tanks by reason of the broken and defective condition of the cock attached to a pipe in the compartment connected with the fresh water tanks. It was alleged that the pipe and cock had no casing around them, or sufficient protection against damage thereto during the loading of the cargo, or by reason of the working of the cargo after the loading thereof, and that the broken and defective condition of the cock either existed at the outset of the voyage or was due to the improper loading of the cargo and the failure to take proper precautions to prevent the cargo from working and coming into contact therewith.

The answer denies that the damage was in any way due to the negligence of the master, agents, or servants of the steamship prior to her sailing from Venice, and that, if damage was due to faults or errors in the management of the steamer, there was no liability because of the exception contained in the bill of lading, which exception is stated in the opinion of this court.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Lorenzo Ullo, of New York City, for appellant.

Carter, Ledyard & Milburn, of New York City (Walter F. Taylor and J. M. Richardson Lyeth, both of New York City, of counsel), for appellees.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The court below reached the conclusion that the damage to the cargo was caused by the escape of fresh water from a pipe in the hold of the vessel, and that the water escaped from the pipe because there was no cock, plug, or stopper in the pipe. The defense claimed that the stopper must have been knocked out of the pipe by the working of the cargo and that the cargo worked or shifted by peril of the sea. The court below reached the conclusion that no such sea peril was shown.

[1] The bills of lading provided that the carrier was not to be liable for loss or damages "occasioned by causes beyond his control, by the peril of seas or other waters, by collisions, stranding, jettison, or other accidents of navigation of whatsoever kind." And it is claimed that the court fell into manifest error in holding that the burden of proof was upon the carrier of the goods to show that perils of the sea caused the damage to the cargo and in holding that the burden had not been sustained. It is admitted that the bales of hemp were received by the carrier in good condition and delivered in bad condition. That being so, there certainly is no question but that the carrier, in seeking to be relieved from liability for damages under the exceptions of perils from the sea, was bound to prove that the injuries were the result of such untoward circumstances as could not have been anticipated and guarded against by the exercise of ordinary care and prudence.

[2] But, conceding the burden to be upon the vessel, was the burden satisfied by the evidence? Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence. See 13 Cyc. 258.

[3] The master of the vessel testified that on December 25th he encountered very bad weather; that his ship was rolling badly and the seas coming on deck. He testified that the feeding tube to the condenser broke, as did one of the valves in one of the boilers; that he was compelled to stop the ship and to lower the sea anchor, to have the ship drag; and that the gale was so strong that the pipe rope he had to the sea anchor broke. He also testified that the cargo was moved by the weather and that on his arrival in port he made a regular protest. The protest states that the ship proceeded on her voyage from December 12th to December 18th with variable winds and weather, and that on the afternoon of the latter day a strong northerly gale set in and the sea was high and rough, the ship rolling and pitching, with heavy seas breaking over the decks; that towards night the weather became worse, and the ship was fearfully shaken by the huge bodies of water dashing over and against the ship. The weather continued bad from that time until after December 26th, the ship rolling and pitching and

having her decks flooded. On December 24th the protest refers to "furious storms," with "high, tempestuous sea, ship laboring fearfully, and decks flooded until afternoon." On December 25th "heavy sea, ship rolling heavily." December 26th, "sea rough, and ship plunging fearfully, and taking seas over all."

There was, however, no testimony in the case showing that the hemp had been damaged by sea water. But there was testimony to show that it had been damaged by fresh water. When the vessel reached New York, and while the cargo was still in the hold, the testimony showed that fresh water was running out of a fresh water pipe and into the compartment where the hemp was stowed. The hold in which the bales of hemp were stowed was one intended to be used when necessary for passengers, and on this particular voyage three-quarters of the whole cargo was in that hold. In this hold there was a fresh water pipe, which the master of the ship described by saying:

"This pipe was coming out through the upper 'tween-deck on the forward bulkhead between the two angle irons and down from the upper 'tween-deck to about five or six feet from the lower 'tween-deck where the cargo was."

The pipe was connected to a tank placed in one of the highest places of the ship and was used to supply the fresh water to the passengers when the hold that on this voyage was used for cargo was occupied by passengers. The tank held between 2½ and 3½ tons of water, and was filled about five times a day from the big storage of water kept in the ballast tanks. When this hold was occupied by passengers a cock was attached to the pipe, which passengers used in drawing water, and when the hold was used for cargo the cock was removed and a brass plug was screwed on in its place. The pipe was of galvanized iron and about three-quarters of an inch thick. The cock or plug was protected by an iron fender, which was fastened to the bulkhead of the ship with two three-quarter inch bolts. When the ship reached New York, it was found that this bracket was hanging down and one of the bolts holding the bracket was gone. The plug which should have been in the pipe was not there, and the claim is that it was there in place originally, but had been displaced by the alleged shifting of the cargo. But if the plug was originally fastened into the pipe, and had been worked out by the shifting of the cargo, it should have been found; but it never was found. This plug, which it was the custom to use, and which should have been used, but apparently was not, was a piece of brass threaded at one end and squared at the other, so that it could be screwed tight with a spanner. The testimony showed that the pipe had not been broken or injured and that the threads inside the pipe were not broken. It would seem that if the plug had been in place, and forced out by the shifting of the cargo, there should have been some indications on the pipe showing the strain to which it had been subjected. We are not convinced that the cargo ever shifted, or that, if it did shift, that it displaced the plug running to the fresh water tank, the water from which in our opinion damaged this cargo.

We have not overlooked the testimony of the master of the ship that a plug was screwed into the pipe at Trieste; but we are unable to accept that testimony, in view of the fact that the carpenter whose duty it

would have been to insert the plug was not called and the log books were not produced. The conclusion to which we have arrived is that the ship was not seaworthy at the commencement of the voyage. There is nothing in the testimony to indicate that the plug was broken off or unscrewed in some way. It seems probable that after the cock was removed, when it was decided to put cargo into the hold, some one failed to screw in the plug. At least such a supposition is as probable as that some movement of the cargo in heavy weather unscrewed it, after it had been screwed into place tightly with a spanner. Presumably the tank would not be in service until the ship was ready to receive passengers, and if there was failure to insert the plug at that time no water would escape. Later, when passengers went on board, and the tank was made ready for their use—for there were other pipes running from the tank to other parts of the ship—the cargo no doubt had been stowed to a point above the aperture, so that the absence of the plug was not noticed.

We are unable to find on this record that the plug disappeared through perils of the sea. The appellant has not sustained the burden of proof, and the decree appealed from is affirmed.