**ALLEN N. SPOONER & SON, INC.,**
**Libellant,**

v.

**The CONNECTICUT FIRE INSURANCE COMPANY, Respondent.**

United States District Court
S. D. New York.
June 29, 1962.

---

496

Burlingham, Underwood, Barron, Wright & White, New York City, Hervey C. Allen, Kenneth H. Volk, New York City, of counsel, for libellant.

Bigham, Englar, Jones & Houston, New York City, Sheldon A. Vogel, New York City, of counsel, for respondent.

LEVET, District Judge.

The libellant in this suit in admiralty seeks to recover upon a marine hull insurance policy issued by respondent. The libellant claims this policy covered damage sustained in loss of libellant's Pulling Machine No. 12 (hereinafter "No. 12") on July 24, 1958, allegedly due to accidental damage on July 24, 1958.

At the time of the accident, when a port guy wire parted and a 75 foot tall leader collapsed, the No. 12 was under a bareboat charter to R. W. Stasch & Company and was being used in salvaging the sunken tanker, Empress Bay, which was located about in the center of the East River between the Manhattan and Brooklyn Bridges.

As a result of the accident, the No. 12 was declared a constructive total loss, since cost of repairs exceeded the insured value of $35,000. The parties have stipulated that in the event of liability, libellant may recover from respondent $32,020 with statutory interest from July 24, 1958. The difference represents a deductible amount of $480 and the value of the hulk after the accident of $2,500.

The issues under the policy are whether the loss of the barge (No. 12) was occasioned by a peril insured against under the policy and whether the loss of the barge resulted from a want of due diligence by the owner of said barge.

The proposed findings of fact, conclusions of law and briefs of the parties having been received, the court, after considering the pleadings, evidence, exhibits, briefs and stipulations of the parties, now makes and files herein its Findings of Fact and Conclusions of Law, separately stated.

## FINDINGS OF FACT

1. Libellant is a corporation duly organized and existing under and by virtue of the laws of the State of New York and with an office for the transaction of business at 143 Liberty Street, Borough of Manhattan, City, County and State of New York.

2. At all times hereinafter mentioned, at the commencement of this suit, the respondent, The Connecticut Fire Insurance Company, was and now is a corporation organized and existing under and by virtue of the laws of the State of Connecticut and was and is engaged in the business of marine insurance, with an office for the transaction of said business within this district at 99 John Street, Borough of Manhattan, City, County and State of New York, and within the jurisdiction of this court.

3. At all times hereinafter mentioned, libellant was the owner of crane barge Pulling Machine No. 12 and prior to the accident hereinafter described said No. 12 was in all respects well found and seaworthy.

4. The No. 12 was a floating derrick, the lifting machinery having been mounted on a wooden barge 139 feet long and 38 feet wide. The tower, or leader frame, was approximately 75 feet high rising almost vertically from the center of the forward end of the barge. The lifting block and cables extended down from the top of the leader frame which was fixed or stationary, being supported by guy wires and steel beams. The hoisting engine was located at the other end of the barge in a small cabin. (Lib. Exs. 3 and 4; SM 46.) The No. 12 was capable of lifting 400 tons. (SM 47; Lib. Ex. 12, pp. 27–28.)

5. Libellant, on July 15, 1958, entered into a bareboat charter with R. W. Stasch & Company for the No. 12 to be used for salvage of the Empress Bay in the East River, New York, N. Y. It further provided that the lessee covenanted and agreed to—

"Return the equipment in the same condition as when received, allowance being made for reasonable usage. Any breakage, damage, or loss to be renewed or replaced to the satisfaction of the LESSOR."

6. In June 1958 libellant agreed to rent the No. 12 to R. W. Stasch & Company to be used in raising the sunken tanker, Empress Bay, lying in about 60 feet of water in the East River about mid-channel between Brooklyn and Manhattan Bridges. (SM 15, 131, 291.) Libellant notified respondent through Carpinter & Baker that it was going to rent the No. 12 to R. W. Stasch & Company to be used in raising the Empress Bay and respondent agreed to this arrangement. At the same time libellant asked that the value of the No. 12 be increased. (SM 17–18, 20, 21, 256–257, 265, 274.)

7. On July 24, 1958, while engaged, in collaboration with certain other craft, all under the control and direction of one Richard W. Stasch of R. W. Stasch & Company, in salvage operations in the East River in New York City in connection with the sunken vessel, Empress Bay, one of the guy wires supporting the lifting crane of the No. 12 parted. As a result, the crane collapsed, was lost over the side, doing severe damage to the hull of the No. 12, which became a constructive total loss.

8. On or about January 7, 1957, respondent executed marine insurance policy No. H231–158 covering various vessels owned by libellant, including the No. 12, valued under the policy at $24,000. Thereafter, on or about December 31, 1957, in consideration of an agreed premium which has been duly paid by the libellant, said policy was renewed with attachments and endorsements extending the term of insurance to December 31, 1958. On or about July 18, 1958, in consideration of an agreed additional premium which has also been duly paid by libellant, the stated value of the No. 12 was increased to $35,000. At the time of the accident marine policy H231–158, issued by respondent, was in full force and effect. (SM 4–5.)

9. The policy contains a so-called "Perils" clause, which is as follows:

"Touching the adventures and perils which we, the said Insurers, are contended to bear and take upon us, they are of the Harbors, Bays, Sounds, Seas and other waters as above named, and Fire, it being the intent of these Insurers to indemnify the Assured for these Insurers' proportion of General Average and/or Salvage Charges and/or loss, damage, detriment or hurt to the said vessel arising from perils aforementioned for which these Insurers may be liable under this policy; it is a condition precedent, however, to any liability under this policy, that the Assured establish that any claim, whether for general average charges, salvage expenses or loss, damage, detriment or hurt to said vessel, has been directly caused by a peril insured against as aforesaid, and that the Assured further establish that such general average charges, salvage expenses or loss, damage, detriment or hurt has not arisen from or been caused by, either directly or indirectly, any of the following or other excluded causes, namely: incompetency of the master or insufficiency of the crew, or want of ordinary care in loading or unloading, stowing or broaching the cargo of the vessel; rottenness, inherent defects, or other unseaworthiness; theft, barratry, or robbery. It is further mutually agreed that this policy does not cover bursting or explosion of boilers, collapsing of flues or injury, derangement or breakage of machinery and/or any expense in consequence thereof or any loss of or damage to any such parts and/or to any other parts of the vessel directly or indirectly resulting from such occurrences, unless the Assured shall establish that such occurrences were caused solely by sinking, stranding, collision with another vessel or burning. No loss is to be paid when such loss arises from failure to keep the vessel well pumped out." (Lib. Ex. 1.)

The policy also contains the so-called "Inchmaree" clause, which is as follows:

"This insurance also specially to cover (subject to the average and all other conditions of this policy not conflicting herewith) loss of or damage to hull or machinery through the negligence of master, mariners, engineers or pilots, or through bursting or explosion of boilers, breakage of shafts, or through any latent defect in the machinery or hull, provided such loss or damage has not resulted from want of due diligence by the owners of the ship, or any of them, or by the manager, but free from any claim for the part in which latent defect existed." (Lib. Ex. 1.)

10. On July 15, 1958, libellant entered into a written contract with R. W. Stasch & Company under which libellant bareboat chartered the No. 12 for the salvage operation. (Lib. Ex. 6; SM 18) Libellant promptly notified respondent through Carpinter & Baker that the charter agreement had been signed and requested that R. W. Stasch & Company be included as a named assured during the period of the charter, which respondent agreed to do. At that time it was also agreed by libellant and respondent that the valuation of the No. 12 be increased to $35,000. These agreements were embodied in an endorsement to the insurance policy executed by respondent. (Lib. Ex. 2; SM 2–3, 7, 18–19, 260, 263; Ans. paragraph Fourth.)

11. The No. 12 was delivered to R. W. Stasch & Company at Pier 31 in the East River on July 18, 1958. (SM 33, 54–55.) The No. 12, including her hoisting equipment, cables, guy wires and machinery, was at this time and on July 23, 1958, prior to the accident, in good condition and seaworthy. (Lib. Ex. 8; SM 25, 34.)

12. Richard W. Stasch of R. W. Stasch & Company was familiar with the No. 12, having used it to lift a sunken

dredge in another salvage operation about a year previously. (Resp. response to Request for Admissions, dated March 31, 1960; Lib. Ex. 12, p. 5; SM 10–12, 16, 49.)

13. Under a contract between R. W. Stasch & Company and the United States, Stasch was to remove the sunken Empress Bay from the bottom of the East River. Various craft, all under the direction of Richard W. Stasch, were attempting to perform the contract. These craft included Stasch's crane or barge No. 336; the Spooner No. 12 chartered by Spooner to R. W. Stasch & Company; the Red Star tug, Roslyn; the derrick, Reggie, a smaller crane barge; two boats belonging to Gates; two small Dravo tugs, and another little boat with which to go ashore. (Ex. 12, p. 9.) Three vessels, the No. 12, the No. 336 and the Reggie, were lashed together, with the No. 336 between the No. 12 and the derrick Reggie.

14. On July 23, 1958, the No. 12 was towed to the scene of the operation and positioned over the Empress Bay, her lifting block being made fast to one end of several wire slings which had been previously placed under the stern of the wreck. (Lib. Ex. 7; SM 34, 35–37, 223.) Lifting barge No. 336, owned by R. W. Stasch & Company, was made fast to the other end of the slings at the stern of the wreck. (Lib. Ex. 7; SM 35–37, 60, 223.) The hoisting tackle of derrick Reggie, also bareboat chartered by R. W. Stasch & Company, was attached to the bow of the Empress Bay. (Lib. Ex. 7; SM 223.) The three lifting units were secured together with the No. 336 in the center and facing down stream, the No. 12 on the Brooklyn side also heading generally downstream, and the Reggie on the Manhattan side heading upstream. (Lib. Ex. 7; SM 55, 59–60, 119, 222, 312, 314; Lib. Ex. 12, pp. 7–8.)

15. On the afternoon of July 24, 1958, preparations were made to begin the operation, the plan being to lift the Empress Bay off the bottom and pull her over to shallow water along the Brooklyn shore in the vicinity of Brooklyn Bridge. (SM 61, 67; Lib. Ex. 12, p. 12.) The weather was partly cloudy, good visibility, light southerly wind. The water was calm, the tide was ebbing at 3.1 knots. (Resp. Ex. D; SM 6, 109, 184.) Richard W. Stasch was in charge of the operation and was positioned on the bow of the No. 12 transmitting orders by a power microphone. (SM 38, 52, 223, 317; Lib. Ex. 12, p. 10.) Note that Stasch went back and forth between the bow of the No. 336 and the No. 12. (SM 224.) Karl Carlsson, a yard mechanic and hoisting engineer, was on board the No. 12 at the salvage operation on the day of the accident to operate the hoisting machinery. He took his orders from Stasch, who paid his salary. (SM 32, 38.)

15A. Richard W. Stasch was doing business under the name of R. W. Stasch & Company. (Stipulation dated June 29, 1962) The above stipulation was in response to the court's request for additional facts in order to determine the relationship of Richard W. Stasch to R. W. Stasch & Company. The record was not clear as to what this relationship was. (SM 20.)

16. The tug Roslyn, owned and operated by Red Star Towing & Transportation Company, was engaged by Stasch to do the pulling. (SM 97–98.) The stern of the Roslyn was made fast to the Empress Bay by a nylon hawser about 200 feet long. (SM 41, 61, 62, 66, 101, 102, 137, 226, 227, 238, 245a.) About 5:00 P.M., upon signal from Stasch, the No. 12, along with the No. 336 began gradually to lift. (SM 38–39, 64, 225; Lib. Ex. 12, p. 11.) After a period of slow lifting, Stasch ordered the No. 12 and the No. 336 to stop. (SM 39–40, 226.) The No. 12 was then under a load of approximately 250 tons. (SM 41, 47, 64; Lib. Ex. 12, pp. 19, 27.)

17. At Stasch's instructions, the tug Roslyn had positioned herself down river from the lifting units heading toward the Brooklyn shore in the area of Brooklyn Bridge. (SM 91, 92, 101–102, 104, 106, 116, 227; Lib. Ex. 12, p. 12.) Upon

**500**

stopping the lift, Stasch ordered tug Roslyn to go ahead slowly on her engine. (Lib. Ex. 12, p. 12; SM 41, 66–67, 103, 226.) Stasch then ordered the Roslyn to increase her revolutions slowly until she was under full power. (SM 104–106.) Throughout the time the tug was pulling, she remained headed in the same direction and made no turns. (SM 92, 106, 227; Lib. Ex. 12, pp. 21–22.) The tug Roslyn carried out all orders given to her by Stasch. (SM 106.)

18. While the salvage operation was so proceeding, about 6:05 P.M. the forward port guy wire of the No. 12 parted, resulting in the leader frame's falling over to starboard onto the deck of the No. 336. (SM 5, 45–47, 107, 185, 221, 227, 313–314; Lib. Ex. 12, pp. 13–14). The tug Roslyn had been pulling about 20 to 30 minutes before the accident occurred. (SM 79, 80, 92, 110, 228; Lib. Ex. 12, pp. 14, 21, 22.) The sunken tanker Empress Bay was not moved as a result but remained just where she was before the tug started pulling. (Lib. Ex. 12, p. 23; SM 110, 239–240.)

19. No proof has been adduced to show that any acts or failure to act on the part of the tug Roslyn, its operators, or on the part of Stasch insofar as his control or direction of said tug, caused or contributed to the accident affecting the No. 12. The tug remained headed in the same direction during the pulling. The Roslyn did not cause the accident and was not negligent.

20. Although the No. 12 was equipped with side slings, Stasch did not use these during the salvage operation. (SM 27, 28, 50.) The purpose of side slings is to steady the lifting load, centering the hoisting cables at deck level so as to avoid the pendulum effect of a heavy load suspended from the top of the leader frame almost 85 feet above water. (SM 162–164, 232.) Side slings are commonly used to control a "hoist load" and have been used in marine salvage operations. (SM 164, 165, 232.) Without the use of side slings, the No. 12 could tilt approximately 3 degrees or slightly above

3 degrees to starboard before the port guy wire would be exposed to a breaking stress of 98,500 pounds. (Lib. Ex. 10; SM 156.)

21. Various Coast Guard vessels were in control or attempted control of river traffic and certain New York City fireboats were nearby in the event of any fire emergency. However, the Coast Guard blockage was not completely effective. (Lib. Ex. 12, pp. 14–15; SM 191–193.)

22. I find that the failure to use the above-mentioned slings (Finding of Fact No. 20) constitutes a want of due diligence on the part of Stasch. I conclude that Stasch was negligent and that such negligence resulted in the accident that occurred herein.

23. As a result of this accident, the No. 12 was severely damaged and upon survey was declared a constructive total loss. (SM 5) It is stipulated that after deducting scrap value and a deductible amount of $480.00, libellant's provable damage is $32,020.00 with statutory interest from July 24, 1958. (SM 6.)

24. Libellant has shown by a fair preponderance of the credible testimony that a large vessel sufficient to create a substantial swell passed the neighborhood of the No. 12 at or just before the accident.

DISCUSSION (Finding No. 24)

Four of libellant's witnesses testified that a large freighter came down the river:

*Edward Jadro,* employed by Stasch, who was on the tug Dravo–50, said it was a black freighter, a little smaller than a Liberty Ship, about 8,000 tons.

*Fred Alcorn,* an operating engineer employed by Stasch, testified to similar effect.

*Frederick Miller,* captain of the tug Roslyn, testified to like effect.

*Karl Carlsson,* a Spooner employee on the No. 12, testified that just before the accident a freighter, black with some red trimming on it, was going downstream.

A summary of the testimony of these witnesses follows.

*EDWARD JADRO,* employed by Stasch and who was on the tug Dravo–50, testified for the libellant.

The Dravo–50 was ordered to slip downstream to stop the vessels going upstream from coming suddenly upon the salvage operation. (SM 181, 182.) The tug was about 1,000 feet south of the derricks (SM 182), headed upstream. (SM 183.)

Jadro, captain, was in the pilot house. (SM 183.) Before this accident there were many boats passing up and down. (SM 184.)

In the period of 20 minutes before the accident there were many small boats and a freighter ship coming down the river. (SM 185, 186.) He saw the freighter coming down favoring the Manhattan shore, passing about 200 feet away from the Dravo–50. There was a ground swell of a foot or a foot and a half "like a roller." (SM 186.) The evidence of an accident on the No. 12 came about a minute or so after the freighter passed the Dravo–50. It was moving 4 to 5 miles per hour. (SM 187.)

At least four 40-foot Coast Guard boats were present. One Coast Guard cutter was also present. (SM 189.) One excursion boat went up the river during the hoisting operations. (SM 193.) The Coast Guard boats made swells. (SM 194, 196.)

He saw the freighter up river about 5 minutes before the accident. (SM 206, 208) It was a black freighter, a little smaller than a Liberty Ship, about 8,000 tons (SM 211), about 400–500 feet long, going about 4 or 5 miles per hour. He noticed no stack markings. (SM 212.) The swell was a little over a foot. (SM 213.)

*FRED ALCORN* was an operating engineer employed by R. W. Stasch & Company on the barge Reggie, an A-frame hoist.

Alcorn said that between the time Stasch ordered the tug to go ahead until the time of the accident there were a few little boats in traffic and a large freighter backed out of a pier upstream a few piers above the Manhattan Bridge and came downstream on the Manhattan side of the Reggie some 200–300 feet away. (SM 228, 229.) Ten to 12 minutes elapsed between the time Alcorn saw the freighter and the time of the accident, and about 2 minutes between the time the vessel passed the Reggie and the time of the accident. He felt a rocking motion on the Reggie after the freighter passed. (SM 230.) There were fireboats and Coast Guard boats on the stream. (SM 231.) Alcorn said it was a large freighter, 400–500 feet, perhaps a little larger than a Liberty Ship, going about 5 miles an hour. (SM 250.) A couple of minutes after it passed, swells occurred and the swells coincided with the accident. The swells rocked the Reggie but he did not notice if they rocked the No. 12. They looked like two-foot waves. (SM 252–253.)

*FREDERICK MILLER,* Captain of the tug Roslyn.

Miller, Captain of the tug Roslyn, saw a freighter of about 10,000 tons coming down the East River on the Manhattan side of the river. (SM 107–108.) There was a little swell (SM 108), but, generally, the water was calm. (SM 109.) There were also Coast Guard picket boats and fireboats. These boats were creating seas or a swell. (SM 109.) Miller did not recall the color of the freighter, but it was about the same size or bigger than a Liberty Ship. (SM 121.) She passed about 500 feet away, but Miller did not see her name or stack marking. There were 2 foot swells as the vessel went by. (SM 124.) The small boats were kicking up one or two foot swells around him. (SM 127.) It was a clear day; very little wind; the surface of the water was flat. (SM 135–136.)

Miller's testimony concerning positions of the freighter in relation to the period of time that the Roslyn was pulling is not clear. (SM 121–124.)

*KARL CARLSSON,* a Spooner employee on the No. 12, testified.

When the hoist was operating just before the accident, a "big ship," a freighter, was going downstream. It was black with some red trimming on it, about 400-500 feet long. (SM 41, 42, 43.) There were swells and a little motion on the No. 12 (SM 45); the tug boat pulled (SM 71) and the guy cables started to part and the leader fell over (SM 45, 46) and it hit the No. 336. (SM 47.)

It is true that there is some discrepancy in the foregoing testimony as to when the freighter came downstream. On the other hand, there is some degree of consistency:

(1) *Jadro,* on the tug Dravo–50, placed the passing of the freighter a minute or so before the accident.

(2) *Alcorn,* on the Reggie, said a couple of minutes after the freighter passed swells occurred and the swells coincided with the accident.

(3) *Carlsson,* on the No. 12, testified that just before the accident the freighter passed downstream.

A number of observers testified that no large freighter passed or that little, if any, traffic passed at that time. These witnesses included:

*Axel J. Pedersen,* a pilot employed by the New York City Fire Department.

*John J. Gumbrecht,* a fireman, first grade, on fireboat tender, Smoke.

*John E. Gibbons* of the United States Army Engineers said that water was calm and there "wasn't any rough seas."

*Richard D. Folkman* of the crew of the Coast Guard cutter Manitou.

*Fred L. Crouch,* a Stasch employee on the No. 336, said he did not remember any big ships at all.

According to Folkman, at 1740 (5:40 P.M.) down river traffic was stopped and two-way traffic was not permitted until 1830 (6:30 P.M.) However, it is questionable if the restriction was absolutely enforced.

A summary of the testimony of such witnesses follows.

*AXEL J. PEDERSEN,* a pilot employed by the New York City Fire Department, testified for respondent.

He was a fireman assigned to fireboat tender Smoke II. (SM 286.) He saw no large freighter on the river. (SM 294.) He saw no large freighter passing at the time of the accident (SM 298) or any swells in the water. (SM 301.)

*JOHN J. GUMBRECHT,* a fireman, first grade, on the fireboat tender Smoke, testified for the respondent. (SM 276.)

His tender, the Smoke, was in the river as standby to two fireboats. (SM 277.) At about the time of the accident, his boat was relieving the crew of the Firefighter, which was tied up under the Brooklyn Bridge. The Smoke came up the East River from the quarters of the Firefighter. (SM 279.) About 5–10 minutes after the Smoke arrived at the tied-up Firefighter, the accident came to his attention and he saw the crane topple over. (SM 280, 281.)

Gumbrecht did not remember passing any traffic in the river. He saw no large vessel going down the river. (SM 282, 283.) He noticed no swells around the water. (SM 284.) When he arrived the water was calm. (SM 285.)

*EDWARD J. BYRNES,* a Lieutenant aboard the fireboat McKean, testified for respondent.

The fireboat McKean was assigned to combat any fire that might develop in the salvage operations. The McKean was on the Manhattan side. (SM 324, 325.) He was observing the activities of the contractor at the time of the accident. (SM 326.) During the period he observed the tug putting on the strain (SM 327), he saw no traffic at all coming down the river. (SM 328.) The surface of the river was normal (SM 330), with nothing unusual. (SM 331.) There was no commercial traffic, no sightseeing boats or tugs or tows. He said: "I am saying definitely that nothing passed by." (SM 353.)

*JOHN E. GIBBONS* of the United States Army Engineers, Chief of the Contract Inspection Section and Supervisory Construction Inspector, testified for respondent.

He was to supervise the inspection of the removal of the Empress Bay from the East River. The contract for removal of the Empress Bay was between R. W. Stasch & Company and the government. (SM 310–311.) On the day of the accident, Gibbons was on the Reggie. (SM 312.) He was there as an observer only. The accident was at about 6:05 P.M. (SM 313.) At that time the water was calm. There "wasn't any rough seas" except some ripples caused by the wind or the backwash from the tug (Roslyn). (SM 314, 315.)

*RICHARD D. FOLKMAN,* who was a member of the crew of the Coast Guard cutter Manitou, testified by deposition for the respondent. (Resp. Ex. G.)

The Manitou was ordered to direct certain traffic control on the East River at the time of the salvage operation. At 1645, eastbound or up river traffic, was stopped and westbound or down river traffic was moved (p. 5). At 1740 the process was reversed. At 1830 orders were received to permit two-way traffic on the river. When traffic was permitted, it was permitted to pass at slow-as-possible speed (p. 6). At 1759, the cutter Sauk reported to the Manitou that a derrick rig on the barge had collapsed (p. 7).

Water conditions on the log were listed as zero, which indicates no swell, which would be a calm or slight sea, and in this case, it would be a calm sea (pp. 9, 10). The witness conceded that the Manitou could not have stopped eastbound or up river traffic because the cutter was on the eastern side of the accident (p. 12). The Sauk, however, was in the immediate area of the accident (p. 13).

*FRED L. CROUCH,* a rigger employee of Stasch in July 1958, testified by deposition for the libellant. (Lib. Ex. 12.)

Although there was traffic on the river, Crouch said: "I wouldn't say nothing big went up or down her." He added: "I wouldn't say there wasn't any, and I wouldn't say there was, but that day I don't remember" (p. 15).

There were black balls up the rigging on the Reggie, indicating that all traffic was supposed to slow down. But a lot of the traffic didn't slow down (p. 16). He stated: "I don't remember any big ships at all" (p. 24). He did not recall any Coast Guard vessel causing any swells at the time of the accident (p. 29). As far as he remembered, the only boat that was running around him at the time of the accident was the fireboat (p. 31).

25. The extent of the actual observation by this latter group of witnesses is, in my belief, limited. The passage of the down-bound freighter, although perhaps not established beyond a reasonable doubt, is proved, I find, by a fair preponderance of the creditable testimony. The negative testimony of the above-mentioned witnesses does not prevail over the affirmative testimony of those who testified that they saw the freighter under the facts and circumstances hereunder. (See The Fin Mac-Cool, 2 Cir. 1906, 147 F. 123, 127.)

26. I find that the libellant has shown by a fair preponderance of the evidence that swells were a culminating factor in causing the accident to the Spooner No. 12.

DISCUSSION (Finding No. 26)

*Jadro,* on the Dravo–50, said the swells were a little over a foot.

*Alcorn,* on the Reggie, said the swells, "looked like two foot waves."

*Miller,* on the tug Roslyn, said that there were two-foot swells, although he also said that there was very little wind and that the surface of the water was flat.

*Carlsson,* on the No. 12, said there were swells and a little motion on the No. 12.

There is no doubt that the forward port guy wire, a 1⅜" steel rope, parted and that as a result the leader frame on

the No. 12 fell. A portion of the best remaining piece of this guy wire was sent to Columbia University and subjected to a strength test, and it was ruptured at 98,500 pounds or 49.25 tons. The expert, Professor Thurston, conceded that what this rope would have withstood in the way of tensile strength in a sound condition he could not say. He also conceded that if the wire, regardless of condition, had been subjected to a full load instantaneously, it would part under substantial stress. Obviously, this condition is physically impossible. Whatever it was, it appears that the forward guy wire was subjected to its breaking stress.

*EMANUEL SILKISS*, a metallurgical engineer employed by Lucius Pitkin, Inc., metallurgical consultants and chemists, testified for respondent.

Mr. Silkiss said that the testing machine used by Professor Thurston was not an accurate measurement of what the wire rope tested by Thurston would have sustained in perfectly whole condition. (SM 359–360.) If there had been no ruptured wires, if the six strands were perfectly normal, it would have sustained a higher load. (SM 360–362.) This was based upon a slow, steady pull of the rope. In regard to the ability of a rope to withstand a sudden application of pressure and a release of pressure, Silkiss testified that "under any condition a sudden application of load would cause the rope to break at a lower strain." Thus, if this rope had been in a perfectly sound condition it would not have withstood a higher load suddenly applied. (SM 364.)

*GLEN M. WILEY* of Havre de Grace Shipyard, Inc., builder of large cranes, derricks and barges, testified for libellant that it would take about a three degree tilt of the No. 12 to subject the port guy wire to a breaking stress of 98,500 pounds. (SM 161–162.) This, he said, could be prevented by the use of slings. (SM 162–165.) Wiley also gave his opinion that a 1⅜″ steel cable which was capable of withstanding a load of 98,500 pounds was adequate for an operation requiring a lifting of 250 tons but that if it were capable of withstanding only a breaking load of 49,250 pounds it would be inadequate. (SM 166, 167.)

Wiley also conceded that a settling back of the Empress Bay could have caused a much greater strain momentarily and caused the guy wire to go. If the barge (No. 12) moved sidewise, it could throw a very unusual strain on the barge and the cable might break. (SM 173.) These things could cause the breaking even with slings. (SM 174.)

Wiley said the raising and settling was a "pretty far fetched idea." (SM 175.) The second possibility (the movement sidewise of the No. 12) seems to have been eliminated throughout the time the tug was pulling for the tug remained headed in the same direction and made no turns. (SM 92, 106, 227; Lib. Ex. 12, pp. 21–22.)

27. Thus, the tilting beyond the angle which the tensile strength of the cable could withstand resulted in the accident.

28. I find that, due to the fact that Stasch had negligently failed to use available side slings, the tilt of the No. 12, caused by waves or swells from the aforesaid freighter, caused the forward port guy wire on the No. 12 to break. I find no evidence of any other cause.

29. On October 3, 1958, respondent denied liability in this matter. (Lib. Ex. 5) Libellant brought suit and a libel was filed in this court on December 30, 1958.

## DISCUSSION (LAW)

### SWELLS

I find that the swells herein are not within the coverage under the "perils" clause of the policy here involved.

Damage from swells from passing ships is not within the insurance term "perils of the sea." Western Assur. Company of Toronto, Canada v. Shaw, 3 Cir. 1926, 11 F.2d 495; Continental Ins.

Co. of City of New York v. Patton-Tully Transp. Co., 5 Cir. 1954, 212 F.2d 543. See also The Giulia, 2 Cir. 1914, 218 F. 744; The Rosalia, 2 Cir. 1920, 264 F. 285; Duche v. Thomas & John Brocklebank, 2 Cir. 1930, 40 F.2d 418; Hecht, Levis & Kahn, Inc. v. New Zealand Ins. Co., 2 Cir. 1941, 121 F.2d 442.

The Western Assur. Company case, supra, is directly in point. There, Davis, Circuit Court Judge, wrote in part:

" 'Perils of the sea' against which underwriters insure are confined to extraordinary occurrences, such as stress of weather, winds and waves, lightning, tempests, rocks, etc. Hazard v. [New England Marine] Insurance Co., 33 U.S. (8 Pet.) 557, 584, 8 L.Ed. 1043. If a loss arises from the ordinary circumstances or wear and tear of a voyage, the insurer is not liable because a seaworthy vessel is supposed to endure usual and customary occurrences. The words are therefore used to describe abnormal causes and extraordinary circumstances. Coles v. [Marine] Insurance Company, 6 Fed.Cas.No.2988, page 65; Moores v. Louisville Underwriters (C.C.) 14 F. 226; Nord-Deutscher Lloyd v. President, etc., of North America, 110 F. 420, 49 C.C.A. 1.

\* \* \* \* \* \*

" \* \* \* The passing of steamers along the Delaware between the port of Philadelphia and the sea is a normal occurrence that may be expected at any time. It was not extraordinary or unusual. It does not seem to us that waves from a passing steamer washing against the shores of the Delaware are a 'peril of the sea' against which the barge was insured. \* \* \*" (11 F.2d 496)

In Continental Ins. Co., supra, the court, in discussing whether waves from a passing towboat was a "peril of the river," pointed out:

" \* \* \* If it be assumed that the waves from a passing towboat did cause and not as we think merely accelerate the sinking, the further question arises: Was it a 'peril of the river' within the meaning of the policy? Was it an extraordinary, abnormal occurrence against which the insureds could not protect themselves with ordinary precaution? Or was it a normal, customary circumstance that may occur every day? The passing of towboats along the Mississippi at the points in question is a normal occurrence that may be expected at any time. It was not extraordinary or unusual and according to Smoot he met and passed big towboats every day. It does not seem to us that displacement waves from a passing towboat are a 'peril of the river' against which the barge was insured. Western Assurance Company [of Toronto, Canada] v. Shaw, 3 Cir., 11 F. 2d 495." (212 F.2d p. 547)

In The Giulia, supra, Circuit Judge Rogers said:

" \* \* \* Perils of the seas are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of human skill and prudence. \* \* \*" (218 F. p. 746)

In The Rosalia, supra, Circuit Judge Hough stated:

"The decisions of this court already contain two accepted definitions of the phrase 'peril of the sea.' The Warren Adams, 74 Fed. 415, 20 C.C.A. 486; The Giulia, 218 Fed. 746, 134 C.C.A. 422. They need not be repeated, further than to insist that the peril which forms a good exception in a bill of lading means something so catastrophic as to triumph over those safeguards by which skillful and vigilant seamen usually bring ship and cargo to port in safety." (264 F. p. 288)

In the Duche case, supra, Circuit Judge Chase, after quoting the definition found in The Giulia, supra, well said:

"* * * A multiplication of definitions will result only in a multiplication of words without serving any useful purpose. The difficult task is not to define in general terms a peril of the sea, but to determine whether some established facts and circumstances, like those proved in this case, fall within a sound definition. * * *" (40 F.2d p. 420)

The Hecht case, supra, was an action upon a policy of marine insurance and the court pointed out that the phrase "peril of the sea" has the same meaning when used in a marine policy as when used in a bill of lading. (121 F.2d p. 442)

It is clear that the swells here involved are not "perils of the sea." The swells were not an extraordinary occurrence. They did not arise from an irresistible force or overwhelming power, which could not be guarded against by the ordinary exertions of human skill and prudence. In effect, a "peril of the sea" situation does not exist in this case.

It has been well stated that "Where the same words have for many years received a judicial construction it is not unreasonable to suppose that parties have contracted upon the belief that their words will be understood in what I will call the accepted sense." (Lord Halsbury in The Thames and Mersey Marine Insurance Company, Limited v. Hamilton, Fraser, & Co., [1887] 12 App. Cas. 484, 490.)

Cases cited by libellant do not appear to be in point. Compania de Navegacion, etc. v. Phoenix Ins. Co., 1928, 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787, involved marine insurance on a small vessel, constructed as a tug on inland waters which was insured for a voyage in tow over the open sea, under policies exacting extra-heavy premiums. It was held that the "perils of the sea" against which the vessel was insured included conditions of wind and water extremely dangerous in her case though not so to ordinary sea-going vessels. In reversing the Court of Appeals, Second Circuit, 19 F.2d 493, Chief Justice Taft wrote in part as follows:

"* * * The view of the Circuit Court of Appeals that 'perils of the sea' has an absolute meaning and may not be varied by the knowledge of the parties as to the circumstances and must be maintained stiffly in favor of the insurance companies and against the insured, is not necessary or reasonable. The variation in the significance of 'seaworthy,' as shown by the above authorities, when caused by exceptional circumstances known to both parties, applies as well to the meaning of perils of the sea as to that of seaworthiness. The two terms in such cases are correlative terms. * * *" (277 U.S. p. 80, 48 S.Ct. p. 463.)

The case at bar involves insurance of a vessel which was to be used in the East River. The No. 12 was customarily used for the lifting of piles. (SM 52–53.) Certainly swells created by passing traffic in such waters as the East River are not exceptional circumstances.

Klein v. Globe & Rutgers Fire Ins. Co., 3 Cir. 1924, 2 F.2d 137, involved swells, winds, and, above all, a log caught between the ship and a barge.

New York, New Haven & Hartford R. Co. v. Gray, 2 Cir. 1957, 240 F.2d 460, concerned a carfloat into which water from a river leaked, causing listing and settling which, in turn, caused cars on the float with their cargo to slide into the river.

Compania T. Centro-Americana, S.A. v. Alliance Assur. Co., D.C.S.D.N.Y.1943, 50 F.Supp. 986, related to a vessel into which there was an accidental incursion of sea water through an opening not intended for the purpose. Moreover, the determination was made under British decisions and statutes.

## "INCHMAREE" CLAUSE [1]

In Finding of Fact No. 22 it was concluded that Stasch's actions constituted a want of due diligence on his part and that he was negligent. Richard W. Stasch was doing business under the name of R. W. Stasch & Company (Finding of Fact No. 15A); therefore, the acts of Richard W. Stasch are the acts of R. W. Stasch & Company. However, does the negligence or want of due diligence of R. W. Stasch & Company (i. e., Stasch) also result in a similar lack of due diligence by the owners of the vessel?

To determine this question, the effect of the charter party must be considered.

Title 46 U.S.C. § 186 is as follows:

" § 186.  Charterer may be deemed owner

"The charterer of any vessel, in case he shall man, victual, and navigate such vessel at his own expense, or by his own procurement, shall be deemed the owner of such vessel within the meaning of the provisions of this chapter relating to the limitation of the liability of the owners of vessels; and such vessel, when so chartered, shall be liable in the same manner as if navigated by the owner thereof."

It would appear that under the above circumstances this section makes acts of the charterer in effect the acts of an owner. Petition of Republic of France, D.C.S.D.Tex.1959, 171 F.Supp. 497, rev'd on other grounds, 5 Cir. 1961, 290 F.2d 395; Scheffler v. Moran Towing & Transportation Co., D.C.E.D.N.Y.1933, 4 F.Supp. 255, rev'd on other grounds, 2 Cir. 1933, 68 F.2d 11; In re New York Dock Co., 2 Cir. 1932, 61 F.2d 777; Stewart v. United States Shipping Board E. F. Corporation, D.C.E.D.N.Y. 1925, 7 F.2d 676.

Generally speaking, therefore, under the conditions specified, a bareboat charterer has the rights of an owner.

The Atlas No. 7, D.C.S.D.N.Y.1930, 42 F.2d 480; Tracy Towing Line v. City of Jersey City, D.C.D.N.J.1952, 105 F.Supp. 910.

The so-called "Rental Contract" from Allen N. Spooner & Son, Inc. to R. W. Stasch & Company, dated July 15, 1958, is a bareboat charter of Pulling Machine No. 12. (See Lib. Ex. 6.) "The demise, in practical effect and in important legal consequence, shifts the possession and control of the vessel from one person to another, just as the shoreside lease of real property shifts many of the incidents of ownership from lessor to lessee." Gilmore and Black, The Law of Admiralty § 4–20 (1957). It is "an instrument for vesting in one person most of the incidents of ownership in a capital asset of that business [i. e., shipping]—the ship—while another retains the general ownership and the right of reversion." Gilmore and Black, op. cit. supra.

"The most important consequences of the distinction between the demise and the other forms of charters flow from the fact that the demise charterer is looked on as the owner of the vessel *pro hac vice*." Gilmore and Black, op. cit. supra at § 4–23. See Leary v. United States, 1872, 14 Wall. 607, 81 U.S. 607, 610, 20 L.Ed. 756; Reed v. United States, 1871, 11 Wall. 591, 78 U.S. 591, 601, 20 L.Ed. 220. "[H]e qualifies as the 'owner' for purposes of the statutes relating to limitation of liability; * * * In general, all *in personam* liability arising out of the ship's operation are brought home to the demise charterer." Gilmore and Black, op. cit. supra. "The vessel, so far as third persons are concerned, is his vessel, and the men are his men; such of their defaults as are attributable to the owner and employer under *respondeat superior* doctrines are his to answer for." Gilmore and Black, op. cit. supra. See also The Barnstable, 1901, 181 U.S. 464, 21 S.Ct. 684, 45 L.Ed. 954.

[1]. With respect to the "Inchmaree" clause, its origin and application under the English decisions, see 2 Arnould, Marine Insurance and Average § 861a (13 ed. 1950),

508

It inevitably follows that the term "owner" in the "Inchmaree" clause (Lib. Ex. 1) here must refer to R. W. Stasch & Company (i. e., Richard W. Stasch), the charterer, which, in effect, *by action of the libellant*, has become the owner for purposes of operation and control and, hence, for responsibility, under the insurance contract. Certainly, it cannot be contended that libellant, by the rental contract above mentioned, can divest itself of the ownership responsibilities under the "Inchmaree" clause. Such a result would be unreasonable.

Consequently, since R. W. Stasch & Company lacked "due diligence," as a result of which the disaster came about, the "owner" clause operates to exempt the insurer from liability.

Since the court has not found the respondent liable under its policy for the loss claimed herein, a determination of the issue of subrogation is not necessary.

Respondent-insurer impleaded Red Star Towing & Transportation Company. This court granted a motion to dismiss the impleading petition. The Court of Appeals held that the order granting the motion was a non-appealable order and thus the Appeals Court had no jurisdiction to entertain it. Allen N. Spooner & Son, Inc. v. Connecticut Fire Ins. Co., 2 Cir. 1962, 297 F.2d 609.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the parties and of the subject matter of this action.

2. The swells which caused the tilt of Pulling Machine No. 12 and the resulting accident (in the absence of the slings aforementioned) are not within the coverage under the "perils" clause of the policy here involved.

3. (a) The lack of due diligence and negligence of Richard W. Stasch (R. W. Stasch & Company) permitted the swells to bring about the accident.

(b) Richard W. Stasch was doing business under the name of R. W. Stasch & Company; therefore, the acts of Richard W. Stasch are the acts of R. W. Stasch & Company.

(c) R. W. Stasch & Company (i. e., Richard W. Stasch), the charterer herein, is the owner of Pulling Machine No. 12 for the purposes of the "Inchmaree" clause.

(d) Because the loss herein resulted from a want of due diligence on the part of R. W. Stasch & Company (i. e., Richard W. Stasch), the owner of the No. 12 for the purposes of the "Inchmaree" clause, it follows that said clause operates to exempt the insurer from liability.

4. The respondent is not liable under its policy for the loss claimed herein.

5. The libel is dismissed with costs.

Submit final decree upon notice in accordance with the opinion herein.