**AMERICAN INTERNATIONAL INSURANCE COMPANY, Plaintiff,**

v.

**The VESSEL SS FORTALEZA, her engines, boilers, etc. and Puerto Rico Maritime Shipping Authority, Defendants.**

**Civ. No. 78–16.**

United States District Court,
D. Puerto Rico.

March 9, 1978.

---

**222**

Charles A. Cordero, Santurce, P. R., for plaintiff.

Jiménez & Fusté, San Juan, P. R., for defendants.

## OPINION AND ORDER

TORRUELLA, District Judge.

This cause came to be heard on the motion of defendant, Puerto Rico Maritime Shipping Authority, for summary judgment dated February 7, 1978. The said motion for summary judgment was accompanied by an affidavit sworn to by the Assistant Manager of the Cargo Claims Department of Puerto Rico Marine Management, Inc., the defendant's management company, together with the Sworn Note of Protest entered by the *in rem* defendant's Master dated January 21, 1977, and after careful consideration of the statements contained in the motion, affidavit, accompanying documents and the Sworn Note of Protest, we deem that the essential facts of the case are not in dispute.

On January 14, 1977, at the Port of Baltimore, Maryland, bill of lading No. 372217989–3 was issued covering a shipment of 3,183 boxes of salad dressing shipped by Kraft Foods and consigned to Colomer and Suárez in Ponce, Puerto Rico. See Exhibit "B" of the motion for summary judgment. The bill of lading is the standard short form bill of lading generally issued by the Puerto Rico Maritime Shipping Authority.

The present action was filed alleging that the plaintiff is an insurance corporation which had insured the goods consigned to Colomer and Suárez, Inc., had paid the consignee for the damage to the goods and had subsequently acquired subrogation rights in the amount claimed in the complaint. It is further alleged that the SS FORTALEZA is a vessel owned by the defendant Puerto Rico Maritime Shipping Authority and that the said Authority issued the bill of lading and accepted to carry the goods in good condition and it is further alleged that the defendant accepted the goods without exception on the bill of lading. The defendant in its answer to the complaint alleges that the shipment was a "shipper's load and count" type of shipment which notation does in fact appear on the face of the bill of lading. The plaintiff alleges that a substantial portion of the food-stuffs delivered to the consignee were in a damaged condition and that the damage totaled the sum of $2,782.38. The plaintiff alleges that the defendant was negligent in the care of the goods and violated the provisions of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 et seq.

The *in personam* defendant, Puerto Rico Maritime Shipping Authority, answered the complaint, admitting certain allegations and denying others and raised affirmative defenses under the various statutes governing ocean carriage of merchandise and specifically raised as an affirmative defense Section 4 of the United States Carriage of

Goods by Sea Act, 46 U.S.C. § 1304, in that neither the carrier nor the ship are responsible for damages proximately caused by perils, dangers and accidents of the sea or other navigable waters, 46 U.S.C. § 1304(2)(c), and that neither the carrier nor the ship is responsible for loss or damage arising from an Act of God, 46 U.S.C. § 1304(2)(d).

## I

The claim which is the object of the complaint was denied to Underwriters Adjustment Company, Inc. through a letter dated March 23, 1977 signed by Mr. Frank Davila, Assistant Manager of Cargo Claims of Puerto Rico Marine Management, Inc. The said letter specifically invokes the exemption for damages to cargo resulting from an Act of God. See Exhibit "A".

In support of defendant's allegation invoking the COGSA perils of the sea and Act of God defense, the defendant accompanied with its motion for summary judgment the Sworn Note of Protest entered on the 21st day of January, 1977 by the Master of the SS FORTALEZA, Captain John R. O'Connor, upon the arrival of the vessel in the Port of San Juan, Puerto Rico. See Exhibit "C" of the motion for summary judgment.

■ Since this Court finds that the weather encountered by the SS FORTALEZA was a fortuitous action of the elements of the sea and was of such force to overcome the strength of a well-found ship and the usual precautions of good seamanship, and thus was a peril of the sea and an Act of God, we will analyze with more detail the uncontroverted description of the weather set forth in the Sworn Note of Protest.

A note of protest is a declaration under oath by the Master and sometimes the crew, of the circumstances attending the loss or damages to the vessel and cargo for the purpose of showing that the loss or damage occurred as result of perils of the sea, and usually concludes with a protestation against any manner of liability of the shipowner to the cargo interest.

According to the Sworn Note of Protest, the SS FORTALEZA sailed from the Port of Baltimore, Maryland at midnight on Tuesday, January 18, 1977 and proceeded with a bay pilot down the Chesapeake Bay. On that same day in the afternoon, the vessel entered into the Gulf Stream with good weather conditions. The air temperature had increased from 18° to 50° by midnight and the barometer reading was 29.58 inches of mercury and falling slowly. The next day, Wednesday, January 19, 1977, the vessel continued proceeding on a true course of 155° direct for San Juan, Puerto Rico encountering moderate to rough northwesterly sea and swells. The vessel was logging a speed of 1 to 2 knots above its normal operating speed. The protest records that during the early morning of the second day of the voyage, January 19, the wind freshened considerably becoming "strong" by definition of force 7 on the Beaufort scale. During the next four hours the wind came generally from the west by south and increased to force 10 on the Beaufort scale, which is equivalent to a "whole gale" or 55 to 63 miles per hour. Between 0800 hours and 1241 hours, the Master made steady speed reductions down to 30 rpm and finally settled on a speed of 40 rpm and hove to on a course of 220° to maintain better steerageway and prevent the vessel's pounding. During this period the vessel was rolling heavily.

Between 1330 hours and 1600 hours several rolls in excess of 40° were noted and water had been shipped into the second deck openings. Several trailers on No. 1 deck forward and aft began breaking loose and the vessel began pumping No. 3 bilges for the remainder of the day and night of January 19. Several more trailers from the top deck were washed overboard and others fell into the ramp openings leading from the top deck to No. 2 deck forward. At 1538 hours while the vessel was in a roll of 40°, the foremast located at the bow of the vessel snapped off its base and fell to the deck. A majority of the trailers in the first three tiers on the top deck at the bow either went overboad or were badly damaged. At 1600 hours the wind was force 10 to 11

and the ship pitched and rolled heavily in high seas and swells. Between 1600 hours and 2000 hours the vessel continued rolling 30 to 40° in mountainous seas and seven additional trailers were washed overboard.

The ship's Master recounts in his Sworn Note of Prótest that sea conditions were extraordinary in that in addition to the wave height, the wave interval was unusually short. He estimated the interval between peaks at 400 to 600 feet. It is apparent that a vessel such as the SS FORTALEZA, 700 feet in length, is subject to a severe pitching action in seas having a shorter peak interval than the overall length of the vessel. According to the Master this produced a severe pounding action, which caused the flat stern of the vessel to slap heavily. The Master expressed concern for the vessel's rudder components.

In order to avoid the heavy pounding and at the same time keep the bow up to the wind to prevent rolling, the Master decided on a compromise course taking the wind and seas broadside on the starboard bow. While hove to in this fashion the wind increased to full storm force and the seas exceeded 40 feet in height. According to the Master, the vessel continued to roll heavily and more trailers were lost. The Master described this compromise as follows: "The choice was between the cargo or the ship and because of the extreme conditions, the issue was in doubt on a few occasions". The Master considered alternatives of heaving to but discarded the alternatives for being "exceedingly risky". Up until 2400 hours on January 19, the wind held at a gale force finally reducing to force 8.

## II

This action is before us pursuant to the admiralty and maritime jurisdiction under Title 28 USC, Section 1333. The Puerto Rico Maritime Shipping Authority's short form bill of lading provides as follows:

"This bill of lading is issued and the goods covered hereby are subject to, and all parties to this contract are bound by the terms, provisions, stipulations and conditions stated in the Carrier's regular long form bill of lading on file with the Federal Maritime Commission and posted on board each vessel and open for shipper inspection at the Carrier's offices and with which the Shipper hereunder is understood to be familiar, which terms, provisions, stipulations and conditions of said long form bill of lading are hereby incorporated by reference in this short form bill of lading with the same force and effect for all purposes as if the same were severally, fully and specifically set forth herein.

This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States of America approved April 16, 1936.

All the terms and conditions of the Carrier's regular long form bill of lading, used in this service, including all clauses presently being stamped or endorsed thereon are incorporated with like force and effect as if they were written at length herein, and all such terms and conditions so incorporated by reference are agreed by Shipper to be binding and to govern the relations, rights or obligations whatever they may be, between or of all who are or may become parties to this bill of lading as fully as if this bill of lading had been prepared on the Carrier's regular long form bill of lading.

This bill of lading shall have effect subject to the Hague Rules contained in the International Convention for the Unification of Certain Rules Relating to Bills of Lading, dated 25th of August, 1924, as incorporated in the Carriage of Goods by Sea Act of the United States of America approved April 16, 1936 or any other legislation making those or like rules compulsory applicable to this bill of lading."

As it is required by Section 2 of the Intercoastal Shipping Act of 1933, 46 U.S.C. § 844, the Puerto Rico Maritime Shipping Authority has published a regular longform bill of lading, which provides at paragraph 1 as follows:

"1. COVERAGE. This bill of lading shall have effect while the containers,

goods and packages are in the custody of the vessel or its agents, its servants and its independent contractors. At all other times the terms and conditions or the connecting carrier's bill of lading (if any) and/or Uniform I.O.O. Bill of Lading. When this bill of lading governs, it is subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which are incorporated herein, and nothing herein contained is a surrender by the carrier of any of its rights, immunities or limitations or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent but not further.

The carrier shall be entitled to avail itself of all rights, limitations, exemptions and immunities provided for in said Carriage of Goods by Sea Act, although the contract of carriage evidenced by this bill of lading may be for the carriage of goods between ports of the United States."

█ Although the offshore trade between the United States and Puerto Rico is governed *ex proprio vigore* by the Harter Act, 46 U.S.C. § 190 et seq., the Carriage of Goods by Sea Act was incorporated into the defendant's regular long-form bill of lading and consequently governs this case. Section 4 of the Carriage of Goods by Sea Act, *supra*, provides in its relevant part as follows:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

(a) . . .

(c) Perils, dangers, and accidents of the sea or other navigable waters;

(d) Act of God;

(e) . . ."

There is no hard and fast definition of what constitutes a sea peril or an Act of God. A definition frequently quoted but criticized by the Courts is the one found in *The Rosalia*, 264 F. 285 (2 Cir., 1920): "The peril which forms a good exception in the bill of lading means something so catastrophic as to triumph over those safe-guards by which skillful and vigilant seamen usually bring ship and cargo to port in safety". *Id.* at 288.

In addition to the action of the wind usually measured by the Beaufort Scale of Wind Forces, the heights and violence of the waves is also related to determine whether a "perils of the sea" exception has taken place. This Court has already noted from the Sworn Note of Protest that the vessel suffered structural damage in that the foremast located at the bow was snapped off, several hundred feet of deck railing, steel deck curbing and ramp railing were destroyed in addition to the fracturing of some of the steel hold down buttons on the deck which secure the front end of the trailers on the deck. If one considers that the trailer in itself is part of the vessel as has been interpreted in many jurisdictions for a wide variety of purposes, then the structural damage included the loss of approximately thirty trailers, which were washed overboard and an undetermined number of trailers damaged in varying degrees.

█ This Court is mindful that not all heavy weather encountered by a vessel can be classified as a peril of the sea or Act of God for purposes of the carrier or the ship enjoying an exemption under the Carriage of Goods by Sea Act. Some weather is not extraordinary for the time of year when the voyage was made. *The Skipsea*, 9 F.2d 887 (2 Cir., 1925); *The Mauretania*, 84 F.2d 408 (2 Cir., 1936).

According to the Sworn Note of Protest the vessel hove to on a course of 220° at 1241 hours on January 19 until 0300 hours on January 20. In other words, it was necessary for the vessel to heave to and she so remained for approximately 15 hours. The storm that the SS FORTALEZA met between January 19 and January 20, although of relatively short duration (approximately 24 hours of force 6 winds or more), was without a doubt one of unusual severity coupled with unusually short wave intervals which caused the ship to pound to such a degree that it could not heave to directly

into the wind and seas without fear for the vessel's hull. In *Philippine Sugar C. Agency v. Kokusai Kisen Kabushiki Kaisha* (The Naples Maru) 106 F.2d 32 (2 Cir., 1939) Judge L. Hand set down:

> "First, as to the salt water damage. We are satisfied that the storm which the ship met between November 28th and December 2d was a 'peril of the sea' within the 28th it was blowing from the northeast with a force of nine on the Beaufort scale, and this kept up until the next morning, when it increased to ten. The wind continued at this velocity until the evening of the 30th, when for a few hours it went back to nine, but by midnight it again reached ten, after which, however, the weather began to moderate until by the early hours of December 2d it had fallen to four. Thus for a period of over three days it was blowing at between fifty and sixty miles an hour-between a 'strong' and a 'whole' gale. The ship was blown about 160 miles south of her course, and three times had to get back on the original great circle, which apparently she did; her normal run of about 230 miles a day was cut to eighty, sixty and forty-four. One life-boat was crushed, and a good deal of the steel super-structure was twisted, broken or carried away." *Id.* at 34.

Although of shorter duration, the storm in our case is of at least the same intensity.

The accepted definition of the phrase "peril of the sea" such as found in *The Warren Adams*, 74 F. 413, 415 (2 Cir., 1896) as repeated by Judge L. Hand in *The Naples Maru, supra,* is as follows:

> "That term may be defined as 'all marine casualties resulting from the violent action of the elements as distinguished from their natural, silent influence'". *The Naples Maru, supra,* at page 35.

Another definition can be found in *The Giulia*, 218 F. 744 (2 Cir., 1974) as follows:

> "Perils of the sea are understood to mean those perils which are peculiar to the sea, and which are of an extraordinary nature or rise from irresistible force or overwhelming power, and which cannot be guarded against by the ordinary exertions of the human skills and prudence." *Id.* at 746.

This Court is mindful that heavy weather *per se* measured by the force of the winds or the height of the waves is not the only element that constitute a peril of the sea. Other considerations such as duration of the weather, size of the vessel, wave intervals, crossing seas, structural damage and other considerations all become important in answering the crucial question of whether a peril of the sea has taken place.

From the evidence presented by the defendant in the form of the Sworn Note of Protest, it appears that the defendant has correctly invoked the "peril of the sea" exception and that the cargo damage was caused by the extraordinary weather conditions encountered by the SS FORTALEZA on voyage 79 South. The defendant therefore is not liable to the plaintiff for the cargo damage alleged in the complaint.

WHEREFORE, in view of the foregoing, judgment shall be entered against the plaintiff in favor of the defendant dismissing the complaint without imposition of costs or attorney fees. The Clerk is ordered to enter judgment accordingly.

IT IS SO ORDERED.